Docket No. 86636–Agenda 6–May 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY ENIS, Appellant.

Opinion filed November 22, 2000.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Anthony Enis, appeals from an order of the circuit court of Lake County dismissing his post-conviction petition without an evidentiary hearing. Because defendant was sentenced to death for the underlying murder conviction, his appeal lies directly to this court. See 134 Ill. 2d R. 651(a)). For the reasons that follow, we affirm the dismissal of defendant’s post-conviction petition.

BACKGROUND

A. Criminal Trials

Defendant was indicted for the murder of Merlinda Entrata. A jury found defendant guilty of first degree murder. Defendant was sentenced to death. On direct appeal to this court, we reversed defendant’s conviction and sentence, based on the prosecutor’s improper cross-examination of defendant, and remanded the matter for a new trial. 
People v. Enis
, 139 Ill. 2d 264 (1990).

On retrial, defendant was convicted of Entrata’s murder and sentenced to death. On direct review, we affirmed defendant’s conviction and sentence. 
People v. Enis
, 163 Ill. 2d 367 (1994). Defendant’s petition for a writ of 
certiorari
 was denied. 
Enis v. Illinois
, 516 U.S. 827, 133 L. Ed. 2d 50, 116 S. Ct. 94 (1995).

The evidence presented against defendant on retrial is discussed in this court’s opinion on direct appeal. See 
Enis
, 163 Ill. 2d at 375-84. We provide a brief summary here.

The victim, Merlinda Entrata, was the complainant in a criminal sexual assault case against defendant that was set to begin trial on August 17, 1987. Defendant had pled not guilty to the sexual assault charge and had been released on a personal recognizance bond. On August 10, 1987, shortly before 7 a.m., police found Entrata’s body in the hallway of her Waukegan apartment building. She had sustained multiple close-range gunshot wounds to the head. 

Prosecution witnesses identified defendant as the man they saw in the parking lot outside the victim’s building on the morning of the shooting. Clara Burk testified that she saw defendant, who was wearing sunglasses, pursue Entrata from the parking lot into the apartment building. Defendant was carrying a box that resembled a lunch box. Dan Thacker testified that he saw a man running after Entrata in the parking lot. The man, whose description fit defendant, was wearing white gloves, white sunglasses and dark clothing, and was carrying a metal lunch box. Richard Hanson identified defendant as the man he saw running in the parking lot. The man was wearing white gloves and white sunglasses. As he ran, the metal box he was carrying fell open and a gun fell out of the box. Sylvia Barrett also saw defendant in the parking lot on the morning of the shooting. Defendant was wearing a dark-blue jumpsuit. In addition, John Twardy saw a man run through the parking lot, drop something, and retrieve it. Twardy lost sight of the man, and then saw a red or maroon car drive away. Twardy testified that the vehicle owned by defendant’s girlfriend, Diane Gonzales, was similar to the car he saw leaving the parking lot. Within two hours of the shooting, police found Gonzales’ car parked outside defendant’s apartment. The hood of the car was warm. Unlike the other cars in the area, there was no dew on Gonzales’ car.

A jury found defendant guilty of Entrata’s murder. Defendant waived a jury at sentencing. The trial court determined that defendant was eligible for the death penalty in that he murdered the victim because she would have been a witness against him in a criminal prosecution (see Ill. Rev. Stat. 1987, ch. 38, par. 9–1(b)(8)), and that there were no mitigating factors sufficient to preclude imposition of the death penalty. The trial court sentenced defendant to death. On direct appeal, we affirmed defendant’s conviction and death sentence. 
Enis
, 163 Ill. 2d 367.

B. Post-Conviction Proceedings

On June 14, 1995, defendant filed a 
pro se
 petition for post-conviction relief. The circuit court appointed counsel to represent defendant in the post-conviction proceedings. The trial court subsequently granted attorney Robert Hauser leave to file an appearance as additional counsel in the post-conviction proceedings. In August 1996, Hauser directed a subpoena to the Waukegan police department, calling for the production of the “entire police file pertaining to Anthony Enis and/or Melissa Entratta [
sic
].” The circuit court granted the State’s motion to quash the subpoena.

On November 27, 1996, defendant, through counsel, filed an amended petition for post-conviction relief alleging that he was denied the effective assistance of counsel at trial and sentencing. Defendant attached numerous affidavits and other documents to the amended petition. On April 17, 1997, the State filed a motion to dismiss the amended petition for post-conviction relief, arguing that defendant’s claims are barred by the doctrines of 
res judicata
 and waiver, and are otherwise unsupported by the record or affidavit.

On April 25, 1997, defendant filed a motion for substitution of judge, alleging that certain rulings and comments by Judge Christopher Starck demonstrated prejudice against defendant. Defendant subsequently filed an amended motion for substitution of judge, with supporting affidavit, containing essentially the same allegations. Defendant’s amended motion was transferred for disposition to Judge Stephen Walter, who denied the motion.

On October 17, 1997, the circuit court granted defendant leave to file a supplement to the amended petition for post-conviction relief. In this supplement, defendant argued that appellate counsel was ineffective for failing to raise, on direct appeal, the issue of trial counsel’s ineffectiveness. The State responded with a motion to dismiss the supplement.

On November 4, 1998, the circuit court dismissed defendant’s petition for post-conviction relief without an evidentiary hearing. The circuit court ruled that the claimed instances of ineffective assistance of trial counsel involved matters of trial strategy, were not supported by affidavit, could have been raised on direct review, or were already considered on direct review. The circuit court also ruled that there were no meritorious claims of ineffective assistance of appellate counsel.

On appeal, defendant challenges the orders of the circuit court dismissing his post-conviction petition without an evidentiary hearing, granting the State’s motion to quash the subpoena directed to the Waukegan police department, and denying his motion for substitution of judge.

ANALYSIS

A. Post-Conviction Hearing Act

The Post-Conviction Hearing Act (Act) (725 ILCS 5/122–1 
et seq.
 (West 1998)) provides a remedy for criminal defendants who claim that a substantial violation of their constitutional rights occurred at the proceedings which resulted in their convictions, when such a claim was not, and could not have been, previously adjudicated. 
People v. Johnson
, 191 Ill. 2d 257, 268 (2000). Issues that were decided on direct appeal are barred by the doctrine of 
res judicata
, and issues that could have been raised on direct appeal, but were not, are deemed waived. 
People v. Cloutier
, 191 Ill. 2d 392, 397 (2000); 
Johnson
, 191 Ill. 2d at 268. Waiver is not implicated, however, where a defendant’s post-conviction claim relies on evidence 
dehors
 the record. 
People v. Holman
, 164 Ill. 2d 356, 362, 376 (1995). The petitioner is entitled to a hearing on his post-conviction claims only where the allegations of the petition, supported by the trial court record and accompanying affidavits, make a substantial showing of a violation of a constitutional right. 
Cloutier
, 191 Ill. 2d at 397; 
People v. Hobley
, 182 Ill. 2d 404, 427-28 (1998). All well-pleaded facts in the petition and in any accompanying affidavits are taken as true. 
People v. Towns
, 182 Ill. 2d 491, 503 (1998). The sufficiency of the allegations contained in a post-conviction petition are reviewed 
de novo
. 
People v. Coleman
, 183 Ill. 2d 366, 388-89 (1998).

With these principles in mind, we consider whether the circuit court erred in dismissing defendant’s post-conviction petition without an evidentiary hearing. Although defendant’s petition raises numerous claims of ineffective assistance of counsel at trial, sentencing, and on direct appeal, we consider only those claims that defendant has raised in this appeal. See 177 Ill. 2d R. 341(e)(7).

B. Ineffective Assistance of Counsel

In order to succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the two-pronged 
Strickland
 test: a defendant must allege facts which demonstrate that counsel’s representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel’s errors, the result of the trial would have been different. 
Strickland v. Washington
, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984); 
People v. Wilson
, 191 Ill. 2d 363, 370 (2000). A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel’s deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; 
People v. Evans
, 186 Ill. 2d 83, 93 (1999). There is a strong presumption that counsel’s performance falls within the wide range of reasonable professional assistance. 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. The failure to satisfy either the deficiency prong or the prejudice prong of the 
Strickland
 test precludes a finding of ineffective assistance of counsel. 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; 
Wilson
, 191 Ill. 2d at 370.

Claims of ineffective assistance of appellate counsel are also evaluated under the 
Strickland
 test. 
People v. Childress
, 191 Ill. 2d 168, 175 (2000). A defendant who claims that appellate counsel was ineffective for failing to raise an issue on appeal must allege facts demonstrating that such failure was objectively unreasonable and that counsel’s decision prejudiced defendant. If the underlying issue is not meritorious, then defendant has suffered no prejudice. 
Childress
, 191 Ill. 2d at 175.

We address individually each of defendant’s claims of ineffective assistance of counsel.

1. 
Opening Statement

Defendant claims that his counsel was ineffective because he made promises to the jury in his opening statement that he did not keep. In his opening statement, counsel indicated that the evidence would show that Merlinda Entrata reported the sexual assault days after it allegedly occurred; that at the time of Entrata’s murder, defendant was with Diane Gonzales, his then girlfriend, now his wife; and that R.C. Burton, defendant’s landlord, told police officers that as he left for work at 6:30 a.m. on the day of the murder, Gonzales’ car was parked outside defendant’s apartment. Defendant argues that no testimony or other evidence was introduced to establish these propositions.

Defendant raises the foregoing claim as a matter separate and distinct from his claim that his counsel was ineffective for failing to call certain witnesses at trial, including those witnesses who could have established some of the propositions listed above. We therefore view defendant’s claim as a challenge only to the propriety of counsel’s opening. Defendant, however, cites to nothing outside the trial court record in support of this claim. Accordingly, this issue could have been raised on direct review. The issue is therefore waived. See
 Johnson
, 191 Ill. 2d at 268; 
People v. Olinger
, 176 Ill. 2d 326, 365 (1997).

2. 
Failure to Call Witnesses

Defendant next claims that his counsel was ineffective for failing to present the testimony of several witnesses that would have rebutted the State’s case in chief and that would have fulfilled promises made to the jury in defense counsel’s opening statement. These witnesses include Moselle Williams, Michael Melius, R.C. Burton, Kathleen Jackson, Roy Norvell, Joseph Caliendo, David Asma, and Dr. Solomon Fulero.

Guiding our review of defendant’s claim is the principle that decisions concerning whether to call certain witnesses on a defendant’s behalf are matters of trial strategy, reserved to the discretion of trial counsel. 
People v. West
, 187 Ill. 2d 418, 432 (1999); 
People v. Reid
, 179 Ill. 2d 297, 310 (1997). Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence (
People v. Wiley
, 165 Ill. 2d 259, 289 (1995)), and are, therefore, generally immune from claims of ineffective assistance of counsel (
Reid
, 179 Ill. 2d at 310). This is not the case, however, where counsel’s strategy was so unsound that no meaningful adversarial testing was conducted. 
West
, 187 Ill. 2d at 432-33; 
Reid
, 179 Ill. 2d at 310.

Moselle Williams

Defendant claims that Moselle Williams, had he been called as a witness at trial, would have testified that he drove Merlinda Entrata to the police station six days after the alleged sexual assault. Defendant argues that Entrata’s delay in reporting the alleged assault, and other evidence that the sexual assault case against defendant was weak, negates defendant’s motive for murdering Entrata.

The issue of counsel’s failure to present evidence as to Entrata’s delay in reporting the alleged sexual assault is barred by the doctrine of 
res judicata
. On retrial, defendant’s counsel attempted to elicit testimony from former Assistant State’s Attorney Steven Simonian that Entrata did not report the alleged sexual assault until May 4, 1987, six days after its alleged occurrence. The State objected, citing a pretrial ruling which restricted the introduction of evidence relating to the sexual assault case. The trial court sustained the objection. On direct appeal, defendant argued that trial counsel was ineffective for failing to raise this issue in a post-trial motion and preserve it for review. Defendant further argued, on direct appeal, that the trial court’s exclusion of this evidence was plain error. 
Enis
, 163 Ill. 2d at 403, 406. We rejected both arguments. We held that, assuming 
arguendo
 trial counsel was ineffective, the result of the trial would not have been different had counsel preserved this claim. 
Enis
, 163 Ill. 2d at 407. We also held that the exclusion of such evidence was not plain error and did not deprive defendant of a fundamentally fair trial. 
Enis
, 163 Ill. 2d at 403-04. Defendant cannot obtain post-conviction relief merely by rephrasing a claim which was previously addressed on direct appeal. See 
Evans
, 186 Ill. 2d at 103; 
People v. Williams
, 186 Ill. 2d 55, 62 (1999).

Defendant also claims that Williams would have testified that Entrata told him that she could not identify her attacker. In support of this claim, defendant attached to his post-conviction petition a copy of an unsigned, unsworn, untitled report that defendant identifies as investigation notes from “Consolidated Investigation Services.” An investigation note, dated February 4, 1988, states that contact was made that day with Williams, who stated that Entrata had told him that she was sexually assaulted by a person wearing a mask and gloves and that she could not identify her attacker.

A claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness. 
People v. Johnson
, 183 Ill. 2d 176, 192 (1998); 
People v. Thompkins
, 161 Ill. 2d 148, 163 (1994). In the absence of such an affidavit, a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant, and further review of the claim is unnecessary. 
Johnson
, 183 Ill. 2d at 192; 
Thompkins
, 161 Ill. 2d at 163. Defendant has failed to support his claim with an appropriate affidavit from Williams. 

Even if we considered the February 4, 1988, investigation note, in lieu of an affidavit, defendant has failed to demonstrate that there is a reasonable probability that the outcome of defendant’s trial would have been different had counsel presented Williams’ testimony. As this court stated on direct appeal, the evidence overwhelmingly proved defendant’s guilt. 
Enis
, 163 Ill. 2d at 403. Williams’ proposed testimony would not have impeached or otherwise discredited the testimony of the three prosecution witnesses who identified defendant as the man they observed in the parking lot outside the victim’s apartment building on the morning of the murder. Further, whatever identification problems the State might have encountered in its prosecution of defendant for the alleged sexual assault of Entrata, that case was, in fact, set to begin trial on August 17, 1987. Williams’ testimony would not have negated defendant’s motive for murdering Entrata on August 10, 1987. We therefore reject defendant’s claim.

We also reject defendant’s related claim that appellate counsel was ineffective for failing to raise, on direct appeal, trial counsel’s ineffectiveness for not calling Williams as a witness. As discussed above, the underlying issue has no merit. Accordingly, defendant has suffered no prejudice due to appellate counsel’s failure to raise this issue on appeal. See 
Childress
, 191 Ill. 2d at 175.

Michael Melius

Defendant next claims that his counsel was ineffective for failing to call as a witness Michael Melius, former public defender for Lake County, who represented defendant in the sexual assault case. According to Melius’ affidavit, defense counsel did not interview him prior to defendant’s retrial. Melius states that he would have testified that the sexual assault case was defensible; that he had advised defendant that there was a good chance of a not-guilty finding; that defendant was a cooperative client; and that defendant never expressed any hostility toward Entrata. The gist of defendant’s claim is that Melius’ testimony would have “blunted” the State’s suggested motive for the murder, 
i.e.
, because defendant expected a favorable outcome in the sexual assault case, there was no need to murder Entrata.

In deciding an ineffectiveness claim, the reasonableness of counsel’s conduct must be judged on the facts of the particular case, viewed as of the time of counsel’s conduct. 
Strickland
, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. In the present case, defendant’s counsel had available to him a record of Melius’ testimony at defendant’s first trial. See 
Enis
, 139 Ill. 2d at 275-76. Melius testified, in relevant part, that statements Entrata made to police indicated that she recognized her attacker as defendant, whom she knew from her place of employment, and that Melius believed he told defendant that the outcome of the sexual assault case depended largely on the credibility of Entrata. 
Enis
, 139 Ill. 2d at 275-76. Defendant’s counsel could have reasonably determined that Melius’ testimony would reinforce, rather than “blunt,” the State’s suggested motive for the murder of Entrata. Accordingly, counsel’s decision not to call Melius was not deficient. Assuming counsel’s decision was deficient, defendant has failed to demonstrate that there is a reasonable probability that the outcome of the trial would have been different. Melius’ proposed testimony, like that of Moselle Williams, would not have negated defendant’s motive for murdering Entrata. Nor would his testimony have called into doubt the testimony of the three eyewitnesses who identified defendant. In the absence of a showing of prejudice, the trial court properly rejected defendant’s claim.

The trial court also properly rejected defendant’s related claim that appellate counsel was ineffective for failing to raise, on direct appeal, trial counsel’s ineffectiveness for not calling Melius as a witness. Because the underlying issue has no merit, defendant has suffered no prejudice due to appellate counsel’s failure to raise this issue on direct appeal. See 
Childress
, 191 Ill. 2d at 175.

R.C. Burton

As his next claim, defendant alleges that counsel was ineffective for failing to present the testimony of R.C. Burton, defendant’s landlord. Burton was hospitalized during the time of defendant’s second trial, and the trial court granted defendant leave to take Burton’s evidence deposition. Counsel ultimately decided, however, to proceed without Burton’s testimony. According to defendant, Burton would have testified that, at 6:30 a.m. on August 10, 1987, he saw Diane Gonzales’ maroon car in the parking lot outside defendant’s apartment. This vehicle, therefore, could not have been the vehicle seen leaving the parking lot outside Entrata’s apartment building that morning.

Defendant has failed to support this claim with the necessary affidavit from Burton. See 
Johnson
, 183 Ill. 2d at 192. Although defendant states in his reply brief that Burton is deceased and not “now” available, it remains unclear whether defendant could have obtained an affidavit from Burton in November 1996 when defendant filed his amended post-conviction petition. Defendant argues that, notwithstanding the absence of an affidavit from Burton, it was “established” in the first trial that Burton would testify that the maroon vehicle was parked outside defendant’s apartment on the morning of the murder. Defendant mischaracterizes Burton’s testimony.

At defendant’s first trial, the State called Burton as a witness. On cross-examination by defense counsel, the following exchange occurred:

“Q. When you left for work on the morning of August 10th at 6:30 in the morning, that maroon car that belonged to Tony and Diane was still parked in the parking space, wasn’t it?

A. I can’t say for sure whether it was or was not.

* * *

Q. Do you remember having a conversation with the Lieutenant Stevenson on that day?

A. Yes.

* * *

Q. Did you tell–isn’t it true you told Lieutenant Stevenson on that date that when you left for work this morning at about 6:30 you noticed a maroon car which Enis drives still in the driveway this morning when you left at 6:30?

A. I don’t know whether I said that or not.”

On redirect, the prosecutor asked Burton whether he remembered talking to an investigator from the public defender’s office on February 7, 1988. Although Burton was not sure of the date, he thinks he told investigators that he could not testify as to whether the maroon car was parked behind the building when Burton left for work on the morning of August 10, 1987. Officer Stevenson subsequently testified that Burton told him that the maroon car was parked behind defendant’s apartment that morning. Thus, contrary to defendant’s contention on appeal, it was not “established” in the first trial that Burton would testify on retrial that the maroon vehicle was parked outside defendant’s apartment on the morning of the murder.

Assuming that Burton’s testimony on retrial was “established” in the first trial, as defendant claims, and that Burton would have testified consistent with his conversation with Officer Stevenson, defendant has waived review of this issue by failing to raise counsel’s ineffectiveness on direct appeal. See 
Olinger
, 176 Ill. 2d at 365. Defendant maintains, however, that his appellate counsel was ineffective as a result. A defendant who argues that his appellate counsel was ineffective for failing to raise a particular issue on appeal must show that the failure to raise that issue was objectively unreasonable and that the decision prejudiced defendant. 
Childress
, 191 Ill. 2d at 175
; Olinger
, 176 Ill. 2d at 365. We must determine, therefore, whether defendant’s underlying claim of ineffective assistance of trial counsel would have been successful if raised on direct appeal. See 
Childress
, 191 Ill. 2d at 175.

Testimony by Burton that Gonzales’ car was parked behind defendant’s apartment on the morning of the murder would have been subject to impeachment based on Burton’s inconsistent statements to investigators and his sworn testimony at the first trial. In addition, there was evidence introduced on retrial tending to establish that the maroon vehicle had been moved on the morning of the murder. See 
Enis
, 163 Ill. 2d at 384. Thus, Burton’s testimony would not have gone unrebutted. Finally, three prosecution witnesses made in-court identifications of defendant. Based on this record, defendant has failed to make a substantial showing that there is a reasonable probability that the outcome of defendant’s trial would have been different had defendant’s counsel introduced Burton’s testimony.

Defendant has, accordingly, also failed to make a substantial showing that appellate counsel was ineffective for failing to raise, on direct review, trial counsel’s ineffectiveness in not calling Burton as a witness. See 
Childress
, 191 Ill. 2d at 175.

Kathleen Jackson

Defendant also claims that his counsel was ineffective for failing to call Kathleen Jackson as a witness at trial. In his post-conviction petition, defendant states that Jackson, who lived in an apartment building adjacent to Entrata’s building, would have testified that, on August 10, 1987, at approximately 6:15 to 6:20 a.m., she was in an elevator in her building, along with a black male. The man was in his early twenties and was wearing white sunglasses. Defendant also alleges that Jackson would testify that defendant was not the man she saw in the elevator. Defendant argues that Jackson’s testimony would have rebutted the testimony of prosecution witnesses who identified defendant as the man in the parking lot outside Entrata’s building on the morning of August 10, 1987.

Although defendant failed to support this claim with an affidavit from Jackson, her testimony is sufficiently documented in this court’s opinion on direct review of defendant’s first conviction. See 
Enis
, 139 Ill. 2d at 279-82. Therefore, on direct review of defendant’s second conviction, defendant could have raised the issue of trial counsel’s ineffectiveness for failing to call Jackson as a witness. We agree with the State that defendant has waived review of this issue. See 
Olinger
, 176 Ill. 2d at 365. Defendant also contends, however, that his appellate counsel was ineffective for failing to raise this claim on direct appeal. We therefore consider whether this claim of trial counsel’s ineffectiveness would have been successful if it had been raised on direct review. See 
Childress
, 191 Ill. 2d at 175.

At defendant’s first trial, the State moved 
in limine
 to preclude defendant from introducing Jackson’s testimony. The trial court granted the State’s motion. On direct review to this court, defendant challenged the trial court’s 
in limine
 order. We held that the trial court did not abuse its discretion in barring Jackson’s testimony. 
Enis
, 139 Ill. 2d at 281-82. We observed that “[t]here is nothing connecting the person Jackson saw with the crime, nor does it necessarily follow that her testimony would have cast doubt over the identification of defendant as the offender.” 
Enis
, 139 Ill. 2d at 282. Defendant cannot now argue that trial counsel was ineffective for failing to press for the admission of Jackson’s testimony, where this court previously held the exclusion of such testimony to be nonprejudicial. See 
Evans
, 186 Ill. 2d at 103 (holding, in the context of post-conviction review, that trial counsel was not ineffective for failing to object to evidence and argument which was previously found on direct appeal to be nonprejudicial). Because defendant’s underlying ineffective assistance of counsel claim would not have been successful if raised on direct appeal, we reject defendant’s claim that appellate counsel was ineffective for failing to raise this claim.

Roy Norvell

The record reveals that the State called Roy Norvell as a witness during its case in chief, but that defense counsel moved to bar Norvell’s testimony. The State expected that Norvell would testify that, three days before the murder, he saw a car in the victim’s parking lot that “look[ed] like” the maroon car belonging to defendant’s girlfriend. The trial court agreed with defense counsel that Norvell’s testimony was too speculative and irrelevant and barred Norvell from testifying. In his post-conviction petition, however, defendant claims that Norvelle would have testified that, on or about August 8, 1987, he saw a black male wearing white sunglasses in the parking lot for Entrata’s apartment, and that in a photographic lineup, he identified another individual, not the defendant, as the man in the white sunglasses. Defendant argues that Norvell’s testimony would have rebutted the testimony of Clara Burk and that counsel was ineffective for failing to call Norvell as a defense witness.

Defendant has failed to support this claim with the necessary affidavit from Norvell. See 
Johnson
, 183 Ill. 2d at 192. Instead, defendant relies on a report from the Waukegan police department documenting an interview with Norvell on August 17, 1987. Defendant also relies on a handwritten report that defendant attributes to Joseph Caliendo, an investigator for the Lake County public defender, which documented a meeting with Norvell on November 9, 1987. In his brief before this court, defendant also cites to the affidavit of Jed Stone, one of defendant’s trial attorneys. Even if we consider these documents in lieu of an affidavit from Norvell, none of the documents support defendant’s contention that Norvell’s testimony would have rebutted Burk’s testimony.

Burk testified, in relevant part, that she saw defendant for the first time on the evening of August 8, 1987, two days prior to the murder, as she was driving through the parking lot of the victim’s apartment complex. Defendant suddenly stepped off the curb in front of Burk’s car, causing her to brake. Defendant and Burk looked directly at each other. Defendant was wearing white sunglasses. On the morning of August 10, 1987, Burk recognized the man pursuing Entrata as the man she saw two days earlier in the parking lot. 
Enis
, 163 Ill. 2d at 378-79.

According to the police report on which defendant relies, Norvell stated that, on August 7, 1987, between 6 a.m. and 6:15 a.m., he observed a burgundy car, with one occupant, parked directly behind his car in the parking lot for the apartment complex where Entrata lived. At 8 a.m., the burgundy car and its occupant were still in the lot. Norvell advised the building manager, Mary Greener. Greener and Norvell went to the parking lot and approached the burgundy car. Greener knocked on the passenger window, and the driver, a black male, rolled down the window. Greener asked the driver a few questions. Norvell said the driver appeared nervous. The police report indicates that Norvell was unable to make a positive photo identification of the driver. Caliendo’s report, however, indicates that Norvell did identify an individual, presumably someone other than defendant. Caliendo’s report also indicates that Norvell could not identify the vehicle he saw, except to say that the car was either red or blue.

These reports do not support defendant’s contention that Norvell would testify that a different black man wearing white sunglasses was seen in the vicinity of the victim’s apartment two or three days before the murder. Rather, Norvell’s testimony, if consistent with the reports on which defendant relies, would establish only that a black male, other than defendant, was seen in a burgundy, red or blue vehicle in the parking lot three days before the murder. The affidavit of Jed Stone adds nothing to defendant’s claim. Stone’s affidavit indicates only that he did not consult with defendant as to the decision not to call Norvell. Based on this record, defendant has failed to make a substantial showing that trial counsel was ineffective for failing to call Norvell as a witness.

Defendant has likewise failed to make a substantial showing that appellate counsel was ineffective for failing to raise, on direct appeal, this issue of trial counsel’s ineffectiveness. A defendant suffers no prejudice from appellate counsel’s failure to raise an issue on direct appeal where the underlying issue is not meritorious. 
Childress
, 191 Ill. 2d at 175.

Joseph Caliendo and David Asma

Defendant claims that trial counsel was also ineffective for failing to subpoena Joseph Caliendo and David Asma, investigators for the Lake County public defender. Defendant attached to his post-conviction petition the affidavits of Caliendo and Asma. Defendant argues that the testimony of Caliendo and Asma would have impeached the identification testimony of Clara Burk, Richard Hanson, and Sylvia Barrett.

Defendant’s claims relating to the impeachment of Burk and Hanson were not raised in defendant’s 
pro se
 post-conviction petition, in his amended petition, or in the supplement to his amended petition. Accordingly, these claims are waived. See 725 ILCS 5/122–3 (West 1998); 
People v. Moore
, 189 Ill. 2d 521, 544 (2000). We consider only defendant’s claim that counsel was ineffective for failing to call Caliendo or Asma to impeach Barrett’s identification testimony.

The affidavits of both Asma and Caliendo indicate that they would testify that on February 4, 1988, they interviewed Barrett. At that time, Barrett stated that she could not remember the color of the sunglasses that the man she saw in the parking lot on August 10, 1987, was wearing; that she did not see the man carrying anything, nor was she aware of whether the man was wearing gloves; that she was not sure that the man in the photograph that she selected was the man she saw in the parking lot; that the man in the photograph “most closely resembled” the man in the parking lot; and that the police stated, following her identification of defendant in a photographic lineup, “Yeah, that is the guy.”

Asma also states in his affidavit that he would testify that he interviewed Barrett on February 18, 1988, following her testimony at a hearing prior to defendant’s first trial. Barrett advised Asma and assistant public defender David Brodsky that she did not recognize defendant, who was seated at counsel’s table, as the man she saw in the parking lot on August 10, 1987. Finally, Asma states that he would testify that, on March 8, 1988, Asma and Brodsky spoke to Barrett by telephone. Barrett told them that she was not sure of the color of the sunglasses; that she does not remember who suggested to her the actual color of the sunglasses; and that, at the February 18, 1988, hearing, defendant looked totally different from the man in the parking lot and the man she selected out of the photographic lineup.

The record discloses that Barrett testified at the second trial that she did not recall whether the man she saw in the parking lot was wearing sunglasses or gloves. Therefore, the proposed testimony of Caliendo and Asma, that Barrett said she did not remember the color of the sunglasses and was not aware if the man was wearing gloves, would not have impeached her testimony. In addition, Barrett was never questioned at the second trial as to whether the man she saw in the parking lot had anything in his hands. The proposed testimony of Caliendo and Asma, that Barrett said she did not see the man carrying anything, would not have impeached her testimony.

With respect to Asma’s proposed testimony that Barrett stated that defendant looked totally different on February 18, 1988, from the man in the parking lot, the record reveals that defense counsel cross-examined Barrett on this matter. Barrett testified, however, that she 
did
 recognize defendant at the February 18, 1988, hearing. Counsel tried to impeach Barrett with her testimony from defendant’s first trial in which she admitted that, on February 18, 1988, she did not recognize defendant and that defendant “looked basically different” on that day. Barrett, however, did not recall giving this testimony. The parties stipulated to Barrett’s testimony from the first trial, and this stipulation was read to the jury. Defendant has failed to demonstrate how counsel’s decision to perfect the impeachment of Barrett by way of stipulation, rather than with Asma’s live testimony, is objectively unreasonable.

The only other matter to which Asma and Caliendo would have testified is that Barrett said she picked the photograph of the person that most closely resembled the man she saw in the parking lot and that police acknowledged, “that is the guy.” Even if we concluded that counsel’s failure to call Asma or Caliendo on this point was deficient, defendant has failed to demonstrate that there is a reasonable probability that the outcome of the trial would have been different had Barrett’s testimony been impeached in this way. Two other witnesses made in-court identifications of defendant. Clara Burk testified that defendant was the man she saw pursue Entrata from the parking lot into the building on August 10, 1987, and Richard Hanson also testified that defendant was the man he saw running in the parking lot that morning. On this record, defendant cannot demonstrate prejudice. Further, it follows that defendant cannot demonstrate that he was prejudiced by appellate counsel’s failure to raise this issue of trial counsel’s ineffectiveness. See 
Childress
, 191 Ill. 2d at 175.

Dr. Solomon Fulero

Defendant next claims that counsel was ineffective for failing to call Dr. Solomon Fulero as an expert witness on the unreliability of eyewitness testimony. At defendant’s first trial, the State moved 
in limine
 to preclude Dr. Fulero’s testimony. The trial court granted the motion. On direct review to this court, we held that the expert testimony would not have aided the trier of fact in reaching its conclusion, and that the trial court did not abuse its discretion in excluding Dr. Fulero’s testimony. 
Enis
, 139 Ill. 2d at 288-89. Of the several “misconceptions” about eyewitness testimony to which Dr. Fulero would have testified, only one had any relevance to defendant’s case. That misconception involved jurors’ beliefs that the more confident a witness appears to be while testifying, the more likely the witness is to be accurate in the identification. 
Enis
, 139 Ill. 2d at 289. Although witness confidence may have been a factor in the case, we did not believe that this factor alone demanded that defendant receive a new trial. 
Enis
, 139 Ill. 2d at 289. We also cautioned against the overuse of expert testimony, explaining:

“Such testimony, in this case concerning the unreliability of eyewitness testimony, could well lead to the use of expert testimony concerning the unreliability of other types of testimony and, eventually, to the use of experts to testify as to the unreliability of expert testimony. So-called experts can usually be obtained to support most any position. The determination of a lawsuit should not depend upon which side can present the most or the most convincing expert witnesses. We are concerned with the reliability of eyewitness expert testimony [citations], whether and to what degree it can aid the jury, and if it is necessary in light of defendant’s ability to cross-examine eyewitnesses. An expert’s opinion concerning the unreliability of eyewitness testimony is based on statistical averages. The eyewitness in a particular case may well not fit within the spectrum of these averages. It would be inappropriate for a jury to conclude, based on expert testimony, that all eyewitness testimony is unreliable.” 
Enis
, 139 Ill. 2d at 289-90.

Defendant argues in his post-conviction petition that, as indicated in Dr. Fulero’s affidavit, the doctor could have testified at defendant’s second trial not only regarding the misconception of witness confidence as a predictor of the accuracy of identification, but also regarding the difficulty of cross-racial identifications. The offers of proof made at defendant’s first trial did not touch on cross-racial identification problems. Defendant, who is black, alleges in his post-conviction petition that of the five eyewitnesses who testified for the State, four were white. The State does not dispute the accuracy of this allegation.

In light of this court’s holding that the exclusion of Dr. Fulero’s testimony at defendant’s first trial was proper, and our admonition against the overuse of expert testimony, we conclude that counsel’s decision not to seek additional opinions from Dr. Fulero, beyond those several opinions disclosed in the first trial, was not deficient. Even if counsel’s decision was objectively unreasonable, defendant has failed to make a substantial showing that he suffered resulting prejudice.

Three witnesses identified defendant as the man seen in the parking lot on the morning of August 10, 1987. Even if all three witnesses are white, Dr. Fulero’s affidavit does not indicate that cross-racial identifications are necessarily inaccurate or that the eyewitness testimony of these particular witnesses is necessarily suspect. Moreover, defendant’s counsel capably placed the issue of the fallibility of the testimony of the State’s eyewitnesses before the jury. On cross-examination and in closing argument, defendant’s counsel aggressively explored the question of the accuracy and reliability of the witnesses’ identification of defendant, as well as the witnesses’ overall credibility. Counsel also argued that misidentification is a common occurrence in every day life. On this record, we cannot say that there is a reasonable probability that the jury’s verdict would have been different had Dr. Fulero testified.
(footnote: 1) Accordingly, we reject defendant’s claim of ineffective assistance of trial counsel, as well as his related claim of ineffective assistance of appellate counsel.

3. 
Failure to Introduce Evidence From Illinois Crime Laboratory

As his next post-conviction claim, defendant asserts that trial counsel was ineffective for failing to present testimony or other evidence that there was no blood on defendant’s clothing, that defendant’s fingerprints did not match those found at the crime scene, and that there was no other physical evidence connecting defendant to the crime. Defendant supports this claim with copies of reports from the Northern Illinois Police Crime Laboratory, which set forth the results of various tests and analyses performed in connection with this case.

The record discloses that defendant’s counsel, in his opening statement, called attention to the lack of physical evidence in the State’s case. Counsel told the jury that there would be no fingerprint evidence, no blood evidence, and no footprint evidence linking defendant to the crime. Counsel elaborated on this theme in his opening, stating, in part, that “no police officer, no laboratory technician, no evidence technician, no chemist can come into this courtroom to say that there’s any evidence that any lead, barium, antimony, copper, things discharged from a gun by gas after firing, were found on any of [defendant’s] clothing.” In closing argument, counsel continued his attack on the lack of physical evidence presented by the State. Counsel argued to the jury that, despite evidence of extensive blood splattering at the crime scene, the victim’s blood was not found on defendant, on his clothing, on his shoes, on his possessions, or inside Gonzales’ car.

Counsel’s decision to challenge the State’s lack of physical evidence, rather than calling a member of the police crime laboratory to testify, was a matter of trial strategy and was not deficient. Accordingly, appellate counsel was not ineffective for failing to raise, on direct appeal, these allegations of trial counsel’s ineffectiveness.

4. 
Failure to Object to Testimony and

 Photographic Evidence

Defendant next claims that his counsel was ineffective for failing to object to the identification testimony of Dan Thacker, to the evidence that Merlinda Entrata took additional security measures at her apartment shortly after the alleged sexual assault, and to the State’s impeachment of its own witness, John Twardy.

Defendant could have raised each of these claims on direct review. We thus agree with the State that defendant has waived review of these issues. See 
Olinger
, 176 Ill. 2d at 365. Defendant maintains, however, that his appellate counsel was ineffective for failing to raise these claims of trial counsel’s ineffectiveness. Accordingly, we must determine whether these claims would have succeeded, had they been raised on direct appeal. See 
Childress
, 191 Ill. 2d at 175.

Dan Thacker

At his first trial, defendant moved the court 
in limine
 to bar any evidence relating to Dan Thacker’s pretrial identification of defendant. The trial court granted the motion. At defendant’s second trial, the court indicated that it would not revisit 
in limine
 rulings from the first trial. In his post-conviction petition, defendant claims that his counsel was ineffective for failing to raise the court’s 
in limine
 order from the first trial as a bar to Thacker’s identification testimony in the second trial. Defendant contends that his counsel “never bothered” to read the prior trial record and therefore failed to make the appropriate objection.

The record discloses that defendant’s counsel made this objection when the State, on retrial, raised the issue of the permissible scope of Thacker’s testimony. Counsel, however, later withdrew any objection to identification testimony from Thacker. To the extent that defendant’s claim is really an attack on counsel’s decision to withdraw his objection, we conclude that defendant has not demonstrated that counsel’s decision was objectively unreasonable.

At defendant’s first trial, Thacker testified on direct examination that, on August 10, 1987, at approximately 6:30 a.m., he saw a woman in a white dress running across the parking lot and a black male wearing dark clothing, white gloves and white sunglasses following the woman. Thacker provided a general description of the man, whom he later saw come out of the building and walk across the parking lot. Defense counsel, on cross-examination, questioned Thacker about the lack of detail in his description of the man he saw. Counsel also elicited testimony from Thacker that he could not make a positive identification of the man he saw in the parking lot from the initial photo array shown to him by police, but that he picked the photograph of the person who had the same general features. Defense counsel further questioned Thacker about the second photo array he viewed. On redirect, Thacker testified that he also picked a photograph from the second photo array, although he was not positive of his identification. Over defense counsel’s objection, the State was allowed to examine Thacker about the live lineup he viewed. Thacker testified that he identified defendant in the lineup, although he was not “100 percent sure.”

At defendant’s second trial, the State sought clarification as to the permissible scope of Thacker’s testimony. The State argued that the type of testimony elicited from Thacker by defense counsel at the first trial was contrary to the trial court’s 
in limine
 order and should not be permitted on retrial. The trial court agreed. The record reflects a colloquy between the prosecutor and defense counsel. Pursuant to their discussion, defense counsel withdrew his objection to Thacker’s identification testimony, but with the understanding that Thacker would testify 
not
 that defendant 
is
 the man he saw in the parking lot, but that defendant merely 
fits the general description
 of the man he saw in the parking lot. Thacker testified consistently therewith.

We conclude that counsel’s decision to withdraw his objection to Thacker’s identification testimony was a matter of trial strategy and was not “so unsound that counsel entirely fail[ed] to conduct any meaningful adversarial testing.” See 
Reid
, 179 Ill. 2d at 310. Even if counsel’s decision was deficient, defendant has failed to demonstrate resulting prejudice where three other witnesses identified defendant in court as the man they saw in the parking lot outside Entrata’s apartment on the morning of the murder.

Because defendant’s claim of ineffective assistance of trial counsel would not have succeeded had it been raised on direct appeal, we reject defendant’s claim of ineffective assistance of appellate counsel. See 
Childress
, 191 Ill. 2d at 175.

Evidence of Security Measures at Victim’s Apartment

At the first trial, the court granted defendant’s 
in limine
 motion to bar evidence that the victim installed homemade security devices in her apartment following the alleged sexual assault. As already noted, on retrial the court indicated that it would not revisit 
in limine
 rulings from the first trial.

At the second trial, Zacarias Meana, Entrata’s uncle, testified that, during the first week in May 1987, he helped his niece move into a new apartment in the same complex where she had been living, and helped her install wooden poles to secure the doors from the inside. Over the objection of defense counsel, photographs of Entrata’s apartment, which showed the make-shift security devices, were also introduced into evidence. Defendant’s counsel later called to the trial court’s attention its 
in limine
 order from the first trial and argued that the introduction of evidence contrary to that order was a ground for a mistrial. The trial court denied the motion for a mistrial.

Defendant claims, in his post-conviction petition, that counsel was ineffective for failing to raise the trial court’s prior 
in limine
 order as a bar to the admission of this evidence. We conclude that defendant’s claim is barred by the doctrine of 
res judicata
. On direct review from defendant’s second conviction, defendant argued that the introduction of Meana’s testimony and the photographs of Entrata’s apartment were irrelevant and prejudicial and should have been excluded. 
Enis
, 163 Ill. 2d at 404-05. We held that any error in the admission of this evidence was not a material factor in defendant’s conviction; that it did not deprive defendant of a fundamentally fair trial; and that it is not reversible error. 
Enis
, 163 Ill. 2d at 404-05. Defendant cannot obtain post-conviction relief by rephrasing this issue as one of ineffective assistance of counsel. See 
Evans
, 186 Ill. 2d at 103; 
Williams
, 186 Ill. 2d at 62.

John Twardy

Defendant also claims that his counsel was ineffective for failing to object to the State’s impeachment of its own witness, John Twardy, with inconsistent statements he made to police regarding the maroon car he saw leaving the parking lot on the morning of the murder.

On direct review of defendant’s second conviction, defendant argued that the State’s improper bolstering of Twardy’s testimony amounts to plain error. We rejected this argument, holding that the evidence was not closely balanced and that defendant was not deprived of a fundamentally fair trial. 
Enis
, 163 Ill. 2d at 402-03. Defendant also argued, on direct review, that his counsel was ineffective for failing to properly preserve this issue for review on appeal. 
Enis
, 163 Ill. 2d at 405. We held that, assuming counsel was ineffective, the outcome of defendant’s trial would not have been different had counsel preserved this issue for review. 
Enis
, 163 Ill. 2d at 407. Accordingly, defendant’s post-conviction claim is barred by the doctrine of 
res judicata
. See 
Williams
, 186 Ill. 2d at 62.

5. 
Right to Testify

Defendant next claims that counsel was ineffective for failing to consult with him about his right to testify, to prepare him to give testimony, and to call him as a witness. According to defendant, after the State rested, counsel advised defendant at that time that he would not be called to testify. Defendant states in his post-conviction affidavit that he would have testified that he did not kill Merlinda Entrata, that he was prepared to proceed with the sexual assault case, and that he was confident of being acquitted of that charge. The post-conviction affidavit of Jed Stone, defendant’s counsel, indicates that Stone has no recollection of specific conversations with defendant about his right to testify, but that it is Stone’s practice to discuss this issue in detail with his clients, at which time he makes a recommendation.

The decision whether to take the witness stand and testify in one’s own behalf ultimately belongs to the defendant. 
Thompkins
, 161 Ill. 2d at 177. Defendant in the present case acknowledges that he was aware of his right to testify. Indeed, defendant took the witness stand at his first trial. See 
Enis
, 139 Ill. 2d at 276-77. Nothing in the present record, however, demonstrates that defendant, at any time, advised counsel of his desire or intention to testify. Moreover, upon learning at trial that he would not be called as a witness, defendant failed to assert his right by informing the trial court that he wished to testify. Thus, defendant acquiesced in counsel’s view that defendant should not take the stand. In the absence of a contemporaneous assertion by defendant of his right to testify, the trial court properly rejected this post-conviction claim. See 
Thompkins
, 161 Ill. 2d at 177-78; 
People v. Brown
, 54 Ill. 2d 21, 23-24 (1973). We similarly reject defendant’s related claim that appellate counsel was ineffective for failing to raise this issue on direct appeal.

6. 
Sentencing Hearing

Defendant next claims that his counsel was ineffective for failing to investigate and present the testimony of various witnesses at both stages of his capital sentencing hearing.

Claims of ineffective assistance of counsel at a capital sentencing hearing are reviewed under the two-pronged 
Strickland
 test. 
People v. Ward
, 187 Ill. 2d 249, 261 (1999); 
Coleman
, 183 Ill. 2d at 403. Thus, in the context of defendant’s post-conviction claim, defendant must allege facts which demonstrate that counsel’s performance fell below an objective standard of reasonableness, and that absent counsel’s errors, there is a reasonable probability that the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
 Ward
, 187 Ill. 2d at 261; 
Coleman
, 183 Ill. 2d at 403.

Eligibility Stage

Defendant alleges that his counsel failed to present evidence that would have rebutted the statutory aggravating factor under which he was found eligible for the death penalty. The trial court found defendant eligible for the death penalty in that defendant was 18 years or older at the time of the offense, and defendant murdered the victim, Merlinda Entrata, because she was a witness against him in another criminal prosecution–the sexual assault case. See Ill. Rev. Stat. 1987, ch. 38, par. 9–1(b)(8). Other than a certified copy of defendant’s birth certificate, the State presented no new evidence at the eligibility stage, relying instead on the evidence presented at trial. Defendant’s counsel presented no evidence. On direct appeal, we held that the State proved defendant’s eligibility beyond a reasonable doubt. 
Enis
, 163 Ill. 2d at 412.

Defendant now argues that counsel should have presented the testimony of Michael Melius and Moselle Williams, as well as evidence that defendant suffers from a neuropsychological impairment. We have already determined in this appeal that the proposed testimony of Melius and Williams would not have negated defendant’s motive for murdering Entrata. We therefore consider defendant’s ineffectiveness claim only with respect to counsel’s failure to investigate and present evidence of neuropsychological impairment. As to this claim, defendant relies on the opinions of neuropsychologist Dr. Michael Gelbort, whose affidavit and evaluations defendant attached to his post-conviction petition.

 Of the several findings and opinions contained in Dr. Gelbort’s evaluations, only one speaks to the issue of defendant’s motivation for the murder of Entrata. Dr. Gelbort expresses his opinion that defendant, at the time of the murder, was suffering from extreme emotional disturbance and that defendant would not have been motivated by a desire to silence the victim. Rather, defendant would have acted in a deviant manner as a result of feeling emotional and psychological rejection by the victim, leading to a loss of control, and that “[t]his would have resulted in [defendant’s] using undue force in an attempt to ‘convince’ [Merlinda Entrata] to change her mind and have a relationship with [him].”

Dr. Gelbort’s opinion as to defendant’s likely motivation for the murder is contrary to the record. Evidence established that defendant shot Entrata four times at close range. Each shot defendant delivered was to Entrata’s head. There were powder burns on her temple. Entrata died from two of the gunshot wounds defendant inflicted. What Dr. Gelbort describes as “undue force,” the trial court aptly described as an “execution.” In addition, there was no evidence adduced at the second trial that defendant desired a relationship with Entrata, that she had rejected him, or that defendant had attempted on the morning of August 10, 1987, or at any prior time to “convince” her to have a relationship with him. At the eligibility hearing, defendant’s counsel argued that one of many reasonable hypotheses for the murder is the spurned-lover hypothesis. The trial court rejected this argument. On this record, we see no reasonable probability that the trial court would have been persuaded that the murder of Entrata was a reaction to Entrata’s alleged rejection of defendant. Thus, there is no reasonable probability that the result of the eligibility proceeding would have been different had defendant’s counsel presented evidence of neuropsychological impairment.

Aggravation-Mitigation Stage

Defendant argues that his counsel was also ineffective at the second stage of his capital sentencing hearing for failing to investigate and present available mitigation evidence regarding defendant’s neurological impairment and social history.

Given the critical importance of mitigation evidence at a capital sentencing hearing, defense counsel has a duty to make a reasonable investigation for potential sources of such evidence or must have a legitimate reason for failing to make a particular investigation. 
People v. Morgan
, 187 Ill. 2d 500, 541 (1999); 
Towns
, 182 Ill. 2d at 510. If mitigating evidence exists, counsel has a duty to introduce it in support of the defendant. 
Towns
, 182 Ill. 2d at 510; 
People v. Griffin
, 178 Ill. 2d 65, 86 (1997). The failure, however, to offer mitigation evidence at a capital sentencing hearing is not itself sufficient to show that counsel was ineffective. Counsel’s decision whether to present a particular witness is generally a strategic choice which cannot support a claim of ineffective assistance of counsel. 
Griffin
, 178 Ill. 2d at 86. Before considering defendant’s claim, we review the evidence introduced at the sentencing hearing.

In aggravation, the State relied upon the evidence introduced at trial. The State also introduced evidence that on May 2, 1987, Merlinda Entrata confided to a hospital coworker that defendant, with whom she worked at a nursing home, had raped her. Entrata said that although he wore a mask and gloves, defendant spoke to her after the attack, and that she recognized his voice. There was also evidence that, after the alleged sexual assault, Entrata requested a shift change so that she could work days, explaining to her supervisor that she had been raped. Entrata never returned to her job at the nursing home.

The State also introduced evidence of prior inappropriate sexual conduct by defendant. In March 1981, when defendant was 14 years old, defendant asked an eighth-grade girl for a kiss. When she declined, defendant swung her to the ground, slapped her in the face and head, and kissed her forcefully. As she left, defendant grabbed her buttocks and told her that he wanted $10 or the same thing would happen the next day. The following year, defendant grabbed the breasts of a female student during a high school swim class. The incident was reported to the dean and to police. In October 1984, when defendant was 18 years old, defendant grabbed a female student by the arm as she was walking home from school and said to her, “You’re coming with me.” Defendant pulled her along for a block and released her when someone called his name. Later that day, defendant telephoned her and said that she should meet him behind the high school the next day or he would get her. Less than three years later, while defendant was out on bond in the sexual assault case involving Merlinda Entrata, defendant groped a female coworker and made comments that suggested he had been following her. The young woman reported the incident to her manager.

The State also introduced defendant’s juvenile record and criminal record as an adult. In September 1981, defendant was adjudicated delinquent based on his involvement in the armed robbery and aggravated battery of the elderly proprietor of a Waukegan laundromat. Defendant was 14 years old. Another older male was also involved. This individual used a butcher knife from defendant’s home during the robbery. Defendant completed his one-year probation.

In November 1983, defendant was arrested for robbery, conspiracy to commit robbery and theft. The charges arose out of an incident in which defendant and others robbed a pizza delivery man. Although a gun was used, defendant was not the gunman. Defendant, who was 17 years old at the time, pled guilty to theft. He was sentenced to 30 months’ probation and 100 hours of community service. Defendant’s reporting habits were poor and he had difficulty maintaining employment. Defendant did, however, successfully complete probation.

In January 1984, defendant was arrested for disorderly conduct, following his refusal to obey police and leave the scene of a fight. Defendant forfeited his bond and was subsequently found guilty. He was sentenced to 20 hours of public service.

In February 1984, defendant was arrested for criminal trespass to land when he remained at Waukegan East High School after being told by the assistant principal to leave the building. Defendant pled guilty and was sentenced to one year of conditional discharge and seven days in jail.

In October 1984, defendant was arrested for battery and disorderly conduct, although the State later entered a 
nolle prosequi
 of these charges. In May 1987, defendant was arrested and charged with the sexual assault of Merlinda Entrata.

During an approximate two-year period ending August 15, 1990, defendant, while incarcerated at Pontiac Correctional Center, committed six minor violations and two major violations, including intimidation, insolence, and disobeying orders. In January 1991, defendant was transferred to the Lake County jail. Based on several violations, his adjustment was described in the presentence investigation report as “poor.”

In aggravation, the State also cited defendant’s aggressive and violent conduct in school. Records establish that during the 3½ years that defendant attended Waukegan East High School, he received numerous suspensions. For example, in November 1980, defendant was suspended for five days following an incident in which defendant, after being told to take his seat, swung his hand at the teacher’s face and said, “Boy was I tempted.” In February 1982, defendant was suspended for five days after telling a teacher, “If you were on my turf, I’d blow you away with a .45!” In February 1984, defendant received a 10-day suspension for hitting a teacher.

Finally, the State relied on victim impact statements from Merlinda Entrata’s family, expressing their grief and profound loss.

In mitigation, defendant called as a witness, Janis Enis, defendant’s older sister. Janis testified that defendant’s family, 
i.e.
, his siblings and mother, decided that Janis would be their “spokesperson.” Defendant’s mother, however, was also present at the sentencing hearing. In her brief testimony, Janis told the court that defendant was a loving brother and a good son; that he has helped her and her siblings with problems; that he is talented, open and warm-hearted; and that she has, and will continue to have, a relationship with him while he is incarcerated.

Defendant also introduced into evidence a sentencing report, compiled by clinical social worker, Jeffrey Eno. The report describes defendant’s difficult childhood. Defendant was one of five children raised by their mother in a single-parent household. Defendant was closest to his older brother Larry; defendant never knew his father. At a young age, defendant was responsible for his younger sister Debra. Due to financial and other circumstances the family frequently relocated. The report acknowledges that defendant was suspended from Waukegan East High School 14 times, but also indicates that there is no evidence that the recommended counseling ever took place. Eno also notes that defendant took the initiative and negotiated terms and conditions under which he was permitted to return to school at Waukegan West High School. Under the guidance of principal Billy Greer, defendant successfully completed high school. None of defendant’s older siblings completed high school.

The report comments favorably on defendant’s current relationships with his family, including his wife, Diane Gonzales, and his newborn daughter. The State argued in rebuttal that defendant’s fatherhood is not a mitigating circumstance. Defendant and Gonzales gave up their first child for adoption, and defendant fathered his newborn daughter while in prison, the result of an obvious rule violation. According to Eno’s report, the first child was given up for adoption because of pressure from Gonzales’ family, who did not approve of her relationship with a black man.

Eno’s report concludes that defendant has adjusted well to prison life, noting that he has been inspirational and supportive of fellow inmates; that he has developed an appreciation for self-expression through poetry and painting; that he has pursued educational interests; and that he has remained committed to his religion. Attached to the report were photographs of some of defendant’s paintings. Defendant separately submitted samples of his poetry and lyrics.

Defendant spoke in allocution at the sentencing hearing. Defendant protested his innocence and expressed concern for his wife and child. Defendant also expressed sorrow for the family of Merlinda Entrata. In responding to the State’s evidence of inappropriate sexual conduct, defendant stated, “I don’t deny those incidents,” although “there is two sides to every story.” In addition, defendant submitted a written statement to the trial court, in which defendant again protested his innocence. Defendant stated that he has used his time in prison wisely; that he has focused on his religion; that he has taken two courses and plans on teaching himself a foreign language; and that he has learned to paint. Defendant commented on his difficult childhood and, in particular, the absence of a father. Defendant also recounted the difficult decision, and one that he regrets, to give up his first child for adoption. He expressed his hope that his daughter will not grow up without a father.

In addition to Eno’s report, defendant submitted a psychological evaluation by Dr. Ronald Ganellen, who evaluated defendant to assess the likelihood of defendant acting in a violent manner if sentenced to life in prison. Dr. Ganellen concluded that defendant is able to understand and comply with the rules and regulations of prison life and that, in his opinion, the likelihood of aggressive or violent behavior is low in the highly structured prison setting.

In further mitigation, defendant submitted numerous letters from a variety of individuals. Nine letters were from friends, church members and ministers, expressing belief in defendant’s innocence and commenting favorably on defendant’s character and religious faith. Seven letters were from staff members of the Lake County jail. Although one letter indicates that defendant has not been a cooperative prisoner, the balance of the letters state that defendant has been disciplined only for minor infractions and that defendant does not pose a threat. Five letters were from other death row inmates, describing the beneficial impact defendant has had on their lives. Defendant also submitted a letter from the prison chaplain, who remembers defendant as pleasant, friendly, respectful, warm and loving, with whom he enjoyed visiting. Finally, defendant submitted letters from David Brodsky and Gerald Block, who represented defendant in his first trial, and James Chadd, who represented defendant in his direct appeal following his first trial. These individuals described defendant as respectful, courteous, intelligent, and understanding, with a capacity for rehabilitation.

In his closing argument, defense counsel focused on defendant’s desire to learn, read and create, which counsel stated is the “essential human condition.” Counsel also elaborated on the love of family experienced by defendant, his ability to be productive while in prison, the positive effect he has had on fellow inmates, and Dr. Ganellen’s opinion that there is little chance of defendant becoming violent if sentenced to life in prison. In summation, counsel argued:

“If you accept the premise, and I think it is founded in the truth, that the death penalty is the last and ultimate punishment and should be reserved for the very few, for the cold and malignant hearted, for those for whom life in prison behind the bars is no solution *** then Tony Enis ought not get a sentence of death. It is that straight forward. *** I’m telling you this from my heart because it is the truth, and you have all of the evidence before you. If society’s death penalty is reserved for the worst, it is undeserved for this man.

* * *

Tony Enis is not a thing. He is a human being. He has been convicted of a terrible crime. *** But he is nonetheless a precious, unique human being *** who can produce both beauty and feeling.

* * *

I beg you, please, please, Judge, perceive this man as a man worthy of redemption and spare his life ***.”

In these post-conviction proceedings, defendant contends that his counsel was constitutionally deficient by failing to investigate and present evidence of defendant’s neuropsychological impairment, as described in Dr. Gelbort’s evaluations, and further evidence of defendant’s social history.

In his evaluations, Dr. Gelbort states that, due to a neuropsychological impairment, defendant’s conduct is less likely to conform to societal norms and that he is less able than a normal individual to exercise self-control. Dr. Gelbort also states that defendant’s impairment may explain why his behavior has been maladaptive in the past and that such impairment would have been present at the time of the murder. Dr. Gelbort further states that defendant’s capacity to relate to women developed in a deviant fashion and that defendant suffers from a Narcissistic Personality Disorder (Atypical). According to Dr. Gelbort, incarceration can be the perfect treatment for a person with defendant’s psychopathology and history. As discussed earlier, Dr. Gelbort also expressed his opinion as to defendant’s likely motivation for the murder.

In contrast to Dr. Gelbort’s proposed testimony, which may suggest an explanation for defendant’s conduct in murdering Entrata, defendant, in both his oral and written statements, protested his innocence of the crime charged. In his written statement defendant states that he will “never stop fighting to prove that fact.” In allocution, defendant stated that, contrary to what the trial court may have heard from witnesses, Merlinda Entrata’s death was not at his hands.

The reasonableness of counsel’s action may be judged with reference to a defendant’s own statements. 
Evans
, 186 Ill. 2d at 96. In the present case, it would have been contradictory for defendant’s counsel to present mitigation evidence that explained why defendant committed the murder when defendant continued to maintain his innocence. Counsel cannot be expected to present mitigation evidence that contradicts his client’s protestations of innocence. Accordingly, counsel’s failure to do so is not deficient. See 
Evans
, 186 Ill. 2d at 96-97; 
People v. Sanchez
, 169 Ill. 2d 472, 491 (1996); 
Holman
, 164 Ill. 2d at 373.

Defendant contends, however, that Dr. Gelbort’s testimony also would have helped explain the aggravating evidence presented by the State and that, under 
People v. Morgan
, 187 Ill. 2d 500 (1999), prejudice is apparent. We disagree.

In 
Morgan
, counsel failed to present any evidence of neurological impairment and brain damage, even though such evidence was readily available from family members, school records and the defendant’s criminal file, and counsel was on notice of the defendant’s history of mental health problems. 
Morgan
, 187 Ill. 2d at 540-44. In contrast, here, the affidavits of family members do not indicate that defendant suffers from some underlying medical or psychological condition. Although defendant was referred to a clinical social worker for a psychological evaluation in 1984 as a condition of his probation, the conclusion of the social worker, that defendant has an antisocial personality disorder, was called into doubt by improper test scoring. In addition, the presentence investigation report states that the psychologist who evaluated defendant upon his entering Pontiac Correctional Center determined that defendant was not in need of any mental health treatment or counseling. Furthermore, counsel in the present case did obtain a psychological evaluation of defendant prior to his sentencing hearing. Dr. Ganellen, who evaluated defendant, found “no signs of underlying psychosis, thought disorder, or cognitive slippage present.”

 Even if defendant’s counsel were faced with some evidence that defendant was neurologically impaired, such evidence is not inherently mitigating. The sentencer may view such information as either mitigating or aggravating, depending on whether the evidence evokes compassion or demonstrates possible future dangerousness. See 
People v. Madej
, 177 Ill. 2d 116, 139 (1997); 
People v. Tenner
, 175 Ill. 2d 372, 382 (1997). For this further reason, we will not deem counsel’s performance deficient.

Defendant also argues that his counsel was ineffective for failing to present further evidence of his social history. Defendant identifies several individuals who he contends could have provided mitigation testimony as to defendant’s difficult childhood, the negative influence of defendant’s brother Larry, and defendant’s respectful conduct toward prior girlfriends.

A comparison of the testimony compiled by defendant on post-conviction, and the evidence introduced at defendant’s sentencing hearing, reveals that much of the new evidence is cumulative, or simply duplicative, of information presented to the trial court. For example, the post-conviction affidavit of Gladys Hicks essentially duplicates her letter to defense counsel, which was submitted in mitigation. Similarly, the post-conviction affidavit of Terry Atwater duplicates, in part, his letter to defense counsel, which was also submitted in mitigation. Additional information contained in Atwater’s affidavit regarding defendant’s difficult childhood and lack of a male role model are addressed in the presentence investigation report, in defendant’s written statement, and in Jeffrey Eno’s report. The post-conviction affidavit of Billy Greer, former principal of Waukegan West High School, contains information as to his relationship with defendant and defendant’s success at Waukegan West. This evidence was already before the trial court in the presentence investigation report, in Eno’s report, and in the testimony of Rose Santiago, one of defendant’s probation officers. Greer’s additional statements in his affidavit expressing shock at learning of the charges against defendant is cumulative of similar statements contained in the letters from friends and clergy which defendant submitted in mitigation at the sentencing hearing. Defense counsel was not deficient for failing to provide cumulative evidence. See 
People v. Henderson
, 171 Ill. 2d 124, 155 (1996).

The new, noncumulative evidence defendant has compiled indicates that defendant idolized his older brother Larry, who was a negative role model; that defendant began to work part-time jobs at an early age; and that defendant’s encounters with the law began at age 9 when he was picked up for vandalism. The new evidence also indicates that when defendant was growing up, the electricity was sometimes turned off for a day or two in the Enis home; that defendant did not always have decent clothing and enough to eat; that defendant witnessed his mother being physically abused by her former husband; that defendant’s mother sometimes disciplined the children with a leather belt; and that there was a lot of confusion and arguing in the home. There was also evidence that defendant was well-mannered and respectful with some of his high school dates.

 The additional evidence defendant cites illustrating his difficult upbringing and the negative influence of his brother is not necessarily mitigating. Evidence of a chaotic childhood, or that a defendant’s upbringing caused him to become violent or aggressive, can be considered in aggravation. See
 Childress
, 191 Ill. 2d at 179; 
Evans
, 186 Ill. 2d at 101; 
Sanchez
, 169 Ill. 2d at 491; 
People v. Henderson
, 142 Ill. 2d 258, 339 (1990). Moreover, defendant’s counsel did present evidence of defendant’s social history. Jeffrey Eno’s report, as well as defendant’s own statements, provide significant detail on defendant’s background. Thus, this is not a situation where defendant’s counsel completely overlooked this type of potentially mitigating evidence.

Assuming, however, that counsel was deficient in failing to investigate and present this additional evidence, defendant must still show prejudice to sustain a claim of ineffective assistance of counsel. Prejudice must be assessed based on the totality of the evidence. It is therefore improper to focus exclusively on the potential mitigating evidence. Rather, the nature and extent of the evidence in aggravation must also be considered. 
People v. Coleman
, 168 Ill. 2d 509, 538 (1995).

In this case, the trial court was presented with evidence of the execution-style murder of the victim; evidence of defendant’s criminal conduct beginning at a young age; evidence of defendant’s threats, intimidation and violence directed toward his teachers; evidence of defendant’s sexually aggressive, if not criminal, conduct toward women; and evidence of defendant’s periodic displays of intimidation and insolence while in prison. On this record, we do not believe that defendant has succeeded in demonstrating prejudice by the failure of counsel to present additional evidence of defendant’s social history.

People v. Thompkins
, 161 Ill. 2d 148 (1994), on which defendant relies, does not require a different result. In 
Thompkins
, we remanded the matter to the trial court for an evidentiary hearing on the defendant’s post-conviction claim that his trial counsel was ineffective for failing to present mitigating evidence from the defendant’s parents, siblings, children and friends. The only witness to testify in mitigation was the defendant’s wife. Although counsel submitted over 50 letters in support of the defendant, most of them were from individuals who did not appear to know the defendant particularly well. Thus, the additional affidavits the defendant submitted in support of his post-conviction claim were not duplicative of evidence introduced at the defendant’s sentencing hearing. We concluded that the live testimony of the affiants may have provided a more complete portrayal of the defendant, rather than letters from persons who did not know defendant well. We therefore remanded the matter for an evidentiary hearing on this issue. 
Thompkins
, 161 Ill. 2d at 166-67.

In contrast, the mitigation evidence compiled by defendant in the present case largely duplicates or is cumulative of evidence introduced at defendant’s sentencing hearing. In addition, many of the letter writers state that they know defendant well. Although the only witness to testify in support of defendant was his sister Janis Enis, she did so as spokesperson for the Enis family. Furthermore, defendant was permitted to speak in allocution. He also submitted a written statement to the court. Unlike 
Thompkins
, we believe that the sentencing judge in the present case was provided with a complete portrayal of defendant. Defendant’s reliance on 
Thompkins
 is therefore misplaced. The trial court did not err in dismissing this claim without an evidentiary hearing.

C. Motion to Quash Subpoena

Prior to filing his amended post-conviction petition, defendant directed a subpoena to the Waukegan police department, calling for the production of “[t]he entire police file pertaining to Anthony Enis and/or Melissa Entratta [
sic
].” The circuit court granted the State’s motion to quash the subpoena. The court noted that defendant did not allege any discovery violations by the State, and that a post-conviction petition is not a new discovery tactic. Defendant argues on appeal that the trial court erred in granting the State’s motion.

Because post-conviction proceedings afford only limited review, and because there exists the opportunity for abuse of the discovery process, circuit courts must be cautious in the exercise of their inherent authority to order discovery. 
People ex rel. Daley v. Fitzgerald
, 123 Ill. 2d 175, 183 (1988). Where a defendant’s discovery request has gone beyond the limited scope of post-conviction proceedings and amounted to nothing more than a “fishing expedition,” this court has upheld the circuit court’s denial of the defendant’s discovery request. See 
Olinger
, 176 Ill. 2d at 370-71. Similarly, in determining whether a defendant’s request for a pretrial subpoena is justified, Illinois courts will consider whether, 
inter alia
, the defendant’s application is made in good faith and whether it is intended as a general fishing expedition. 
People v. Shukovsky
, 128 Ill. 2d 210, 225 (1988). We believe the same concern applies when a circuit court is faced with a challenge to a defendant’s use of a subpoena in post-conviction proceedings.

Discovery was conducted in both of defendant’s criminal trials. Defendant did not argue in the circuit court that a discovery violation occurred. Defendant also did not claim a 
Brady
 violation. Rather, defendant simply argued that there may exist something in the police file that police withheld, which could lead to exculpatory evidence. Under these circumstances we conclude that defendant’s subpoena was little more than a fishing expedition and that the circuit court did not abuse its discretion in granting the State’s motion to quash.

Kyles v. Whitley
, 514 U.S. 419, 131 L. Ed. 2d 490, 115 S. Ct. 1555 (1995), on which defendant relies on appeal, does not support his contention that the circuit court erred. In 
Kyles
, the United States Supreme Court reversed a decision of the Court of Appeals for the Fifth Circuit that rejected the defendant’s claim for federal 
habeas corpus
 relief based on a 
Brady
 violation. The opinion does not speak to the appropriate scope of discovery, or the requirements for issuance of a subpoena, on post-conviction review. Accordingly, we reject defendant’s contention of error.

D. Motion for Substitution of Judge

As a final matter, defendant contends that the circuit court improperly denied his motion for substitution of judge at post-conviction proceedings. In his motion for substitution, defendant alleged, in relevant part, that Judge Christopher Starck agreed to allow Robert Hauser to file his appearance as additional counsel on behalf of defendant, so long as Hauser’s fees were not paid by Lake County; that Judge Starck commented that the subpoena to the Waukegan police department may be “burdensome”; that Judge Starck refused to order the production of the entire police file; and that Judge Starck questioned whether defendant had a right to respond to the State’s motion to dismiss defendant’s post-conviction petition. Defendant argued that Judge Starck’s comments and conduct indicate prejudice against defendant. The State opposed the motion. After argument by the parties, Judge Stephen Walter, to whom defendant’s motion for substitution of judge was transferred, denied the motion. Judge Walter found that defendant’s allegations were not supported by the record, or that the complained-of conduct by Judge Starck did not evidence prejudice. We agree.

A defendant does not have an absolute right to substitution of judge at a post-conviction proceeding. 
Madej
, 177 Ill. 2d at 163; 
People v. Steidl
, 177 Ill. 2d 239, 264 (1997). Rather, a defendant must demonstrate that he will be substantially prejudiced if his motion for substitution is denied. 
Steidl
, 177 Ill. 2d at 264.

The record in the present case reveals that, contrary to the allegations in defendant’s motion for substitution, Judge Starck did not condition the filing of attorney Hauser’s appearance on the payment of his fees from sources other than Lake County. When Hauser first appeared before Judge Starck, Hauser volunteered that “the Capital Project will pay whatever fees are involved *** so it won’t cost the county.” Judge Starck simply reiterated that arrangement when he granted Hauser leave to file his appearance.

As to Judge Starck’s refusal to order the Waukegan police department to produce its entire file, we have determined that the court did not abuse its discretion in granting the State’s motion to quash the subpoena. Moreover, the entry of an adverse judgment, standing alone, is not evidence of judicial bias. 
People v. Hall
, 157 Ill. 2d 324, 335 (1993). Judge Starck’s initial observation that compliance with the subpoena may be “burdensome” is also not indicative of prejudice. Judge Starck ordered the parties to submit authority in support of their respective positions regarding the State’s motion to quash; he heard argument on the motion; and he ultimately granted the motion on grounds unrelated to whether compliance with the subpoena would be burdensome.

 Finally, we do not believe that defendant’s allegation that Judge Starck expressed uncertainty as to whether defendant had a right to file a response to the State’s motion to dismiss the post-conviction petition evidences bias. Judge Starck merely requested that defendant provide authority to support his position. Such a routine request is not indicative of prejudice. Accordingly, the circuit court did not err in denying defendant’s motion for substitution of judge.

CONCLUSION

For the foregoing reasons, we affirm the order of the circuit court of Lake County dismissing defendant’s post-conviction petition without an evidentiary hearing. We also affirm the order of the circuit court quashing the subpoena directed to the Waukegan police department and the order of the circuit court denying defendant’s motion for substitution of judge. We further direct the clerk of this court to enter an order setting Thursday, March 15, 2001, as the date on which the sentence of death, entered by the circuit court of Lake County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1998). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

Affirmed
.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Enis’ murder conviction should not be disturbed. In my view, however, his sentence of death cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in 
People v. Bull
, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). Enis’ sentence of death should therefore be vacated, and the cause should be remanded to the circuit court for imposition of a sentence of imprisonment. 720 ILCS 5/9–1(j) (West 1998).

FOOTNOTES
1:     
1
We have assumed, for purposes of evaluating defendant’s post-conviction claim, that Dr. Fulero’s testimony regarding problems associated with cross-racial identifications would have been properly admitted at trial. We express no opinion, however, as to whether such expert testimony generally aids the trier of fact in reaching its conclusion.