2025 IL App (1st) 230804-U

No. 1-23-0804

Order filed July 25, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Respondent-Appellee, | ) ) | |
| v. | ) ) | No. 09 C 66040001 |
| RICKEY MITCHELL, | ) ) | Honorable Geraldine D'Souza, Judge, Presiding. |
| Petitioner-Appellant. | ) | |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mikva concurred in the judgment.
Justice Oden Johnson dissented.

**ORDER**

¶ 1    *Held:*    We affirm the circuit court's second-stage dismissal of defendant's postconviction petition over his contention that postconviction counsel provided unreasonable assistance.

¶ 2    Defendant Rickey Mitchell appeals from the second-stage dismissal of his postconviction petition. On appeal, defendant contends that his postconviction counsel failed to provide reasonable assistance as required by Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). Defendant argues that postconviction counsel provided unreasonable assistance because counsel supplemented his *pro se* petition with a claim that trial counsel was ineffective for failing to call

an expert on the subject of secondary DNA transfer, but postconviction counsel failed to attach an affidavit from such an expert to support this claim. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4         Following a bench trial, defendant was convicted of two counts of predatory criminal sexual assault and one count of aggravated criminal sexual abuse. Defendant was sentenced to 35 years in prison for each predatory sexual assault count, to be served consecutively, and 7 years for the aggravated criminal sexual abuse count, to be served concurrently. The convictions all stemmed from events occurring on February 16, 2009, involving a then eight-year-old minor named J.T.

¶ 5         On direct appeal this court affirmed the trial court's judgment. *People v. Mitchell*, 2016 IL App (1st) 133126-U. In that order, this court described the trial, and we incorporate that order by reference. We repeat the facts necessary to understand the issue in this appeal.

¶ 6         The following facts were not in dispute at trial: Defendant, age 46, and J.T.'s mother, Alexis, had been friends for years. On February 16, 2009, defendant picked up J.T., age 8, from her home, drove J.T. to defendant's home, and then drove J.T. home that evening. Defendant acknowledged at trial that he was the only adult male who had contact with J.T. from the time that he picked J.T. up to the time that he dropped J.T. off at his home. On February 18, 2009, after an outcry by J.T., his mother took him to a hospital where he was examined by a nurse and a doctor. The parties stipulated that if Nancy Healy, a registered nurse, was called to testify, she would have testified that she performed a sexual assault kit on J.T., including swabs, and that J.T.'s physical examination revealed no evidence of injury. The parties further stipulated that, if Karlee Kane, a forensic scientist with the Illinois State Police, was called to testify, she would have testified that

it was her opinion, within a reasonable degree of scientific certainty, that "semen was indicated but no sperm was observed on the buttock swab collected from J.T."

¶ 7 In addition, the State called Katherine Sullivan, a DNA expert, who testified, among other things, that one sample she examined from J.T.'s buttock swab contained DNA from a single male matching defendant.

¶ 8 Defendant testified, among other things, that he had "sexual contact" with a female friend at his home shortly before J.T. sat on his bed to watch a movie, and that J.T. never took off his underwear while at his house.

¶ 9 At trial, J.T.' s mother, Alexis, testified that she and defendant had been friends for years, defendant was like an uncle to J.T., and in 2009, she saw defendant three or four times a month. At approximately 3 p.m. on February 16, 2009, defendant picked up J.T. to take him to play video games with some other children. After defendant brought J.T. back home at 9 p.m., Alexis noticed "a musty odor about him" and thought J.T. was avoiding her. J.T. went to school the next day, and when he returned home that day, she told him he needed to explain why he "smell[ed] like that." J.T. began crying immediately and told her that "Uncle Rickey had put his penis in his butt." Alexis called the police and then took J.T. to the hospital the next morning.

¶ 10 On cross-examination, Alexis testified that when she initially asked J.T. about the musty smell, he replied that he and defendant had wrestled.

¶ 11 J.T., who was 12 years old at the time of trial, testified that on the date of the incident, defendant picked him up from his home and drove him to defendant's apartment. After they entered defendant's apartment, defendant told J.T. to take off his pants and go into the bedroom, which J.T. did. Defendant then entered the bedroom and told J.T. to take off his underwear. At some point, defendant took off his pants and was not wearing underwear. J.T. was lying on the

bed, and defendant was lying on the bed behind J.T. Then J.T. felt defendant's "penis on my butt." J.T. testified: "Before he put his penis in my butt, he put Vaseline [*sic*], I think. It was greasy, and he put it in my butt." J.T. explained that defendant "stuck his finger" with the Vaseline in J.T.'s butt, before defendant then put his penis in J.T.'s butt.

¶ 12     J.T. testified that, at some point, he heard a knock on the door, and defendant told J.T. to put on his clothes quickly. Defendant put on his clothes quickly and went to the front door. Defendant then returned to the bedroom and told J.T. he could take his clothes off. J.T. did not want to, but he did it anyway. Defendant took off all his clothes, put his finger in the Vaseline and stuck his finger in J.T.'s butt again. J.T. testified that he was lying on the bed and defendant "stuck his penis in my butt again." J.T. testified that defendant "stopped for a moment, but I saw suds coming out of his penis." J.T. explained that the suds were like "white stuff."

¶ 13     J.T. testified that it was getting dark and time for him to go home, and defendant told him to get dressed. Defendant then drove J.T. home, but stopped in front of J.T.'s home and told him not to tell his mother or defendant would be in trouble. J.T. liked defendant so J.T. did not tell his mother that day. When J.T. got home from school the next day, his mother asked him "what was really going on," and J.T. was scared for defendant and started crying. J.T. was scared for defendant because J.T. knew defendant would be in trouble. J.T. told his mother what happened and then he talked to the police.

¶ 14     Sergeant Casey Erickson testified that, on February 19, 2019, he and his partner interviewed defendant at the police station. Defendant told the detectives that he was a family friend of J.T., and that on February 16, he picked up J.T. to take him to a party where there would be other children. However, defendant found out the party was over, so defendant took J.T. to defendant's home to watch a movie. Defendant and J.T. went into the bedroom, where the

television was located, to watch the movie "Click" and they sat on the bed. Defendant went into the kitchen and when he returned to the bedroom, he noticed that J.T. was wearing only his underwear. Defendant then went to the bathroom, after which he sat back down on the bed and they began wrestling in a playful manner. Defendant had previously taken off his shirt because it was hot and, when defendant walked out of the bathroom, he was wearing briefs, a pair of boxer shorts, and a pair of jeans which were unbuttoned because he had just finished using the bathroom.

¶ 15　　Defendant stated that, after wrestling, they returned to watching the movie, and then a short time later, they started wrestling again. When they were wrestling, defendant's penis came out of both pairs of underwear and rubbed against J.T.'s back, and defendant ejaculated on J.T.'s backside. Defendant panicked because nothing like that had happened before, and he immediately wiped off J.T.'s backside with a towel. Defendant asked J.T. if he was okay, and J.T. told defendant that he was. When Sergeant Erickson asked defendant if he had placed anything on himself or on J.T., defendant stated that he often wears lotion all over his body and that he had placed "a Vaseline-type substance" on his penis.

¶ 16　　Defendant stated that he told J.T. that "Boys aren't supposed to do this with other boys," and he asked J.T. not to tell his mother. They both got dressed, and then defendant took J.T. home. Defendant stated that he and J.T. were alone in his apartment for approximately an hour and a half but he was not sure about the amount of time.

¶ 17　　Sergeant Erickson testified that, toward the end of the interview, defendant was visibly upset, began crying, and said he never meant to hurt J.T. Sergeant Erickson testified that in an interview with defendant the next day, he reiterated the same events with one change. This time, defendant stated that, when he walked out of the bathroom, he was not wearing pants and was wearing only two pairs of underwear.

¶ 18 On cross-examination, Sergeant Erickson testified that his report was based on his memory of the conversations with defendant, and defendant did not provide a handwritten statement.

¶ 19 Defendant, who was 50 years old at the time of trial, testified that he knew J.T.'s mother Alexis "on and off" for 20 years, and in February 2009, they had "recently just started" speaking again. Defendant testified that on February 16, 2009, he went to his friend Emerson Branch's house at around 10 a.m. Since defendant had a one-bedroom apartment, he had sleeping bags, and his guests slept in the living room. Defendant headed back to his apartment, arriving at 3:15 p.m. Between 3:15 p.m. and 5:30 p.m., defendant's friend Anita came over to his apartment and they "messed around" and had "sexual contact." After Anita left at 5:30 p.m., defendant returned a call from Alexis who asked defendant to come and get J.T. At first, defendant "wasn't going to go and get him," but defendant subsequently decided to do so.

¶ 20 Defendant testified that, when he arrived at her home, she asked if he was "still" taking J.T. Defendant explained that they had planned for defendant to take J.T. to Branch's home so J.T. "could play with the other kids" there. At 6 p.m., defendant took J.T. and drove toward Branch's house. On the way there, defendant called Alexis as well as Branch to make sure the kids were still there, but neither of them answered. Defendant drove to his own home, and once there, defendant directed J.T. to the bedroom, which had the only working television.

¶ 21 Defendant testified that J.T. picked out a movie and that, after putting on the movie, he began cleaning the apartment. While cleaning, he would go to the bedroom to check on J.T. Although defendant had chairs in the bedroom, J.T. sat on the bed to watch the movie. In February 2009, the thermostat was broken so the temperature in his apartment was over 85 degrees. Defendant never told J.T. to take off his pants or underwear, but at one point, when defendant went

back to check on J.T., defendant noticed that J.T. was wearing only a t-shirt and underwear. Although defendant assumed that J.T. took off his pants because he was hot, defendant said: " 'Hey, we getting ready to go in a minute. Why did you do that?' " J.T., who was jumping up and down on the bed, did not answer. Defendant never inserted his finger or penis into J.T.'s anus, applied Vaseline, or ejaculated. At some point, the movie was ending, and defendant had finished straightening up, so defendant told J.T. to get ready to go.

¶ 22 Defendant testified that he drove J.T. home, arriving between 7 and 8 p.m. Defendant estimated that J.T. was at his home for about 1 hour and 45 minutes. When defendant arrived at Alexis's home, they spoke for about 15 or 20 minutes before he left. During their conversation, she did not say anything about a musty odor emanating from J.T. Two days later, the police came to his house and handcuffed him immediately.

¶ 23 Defendant did not tell them that he had any type of sexual contact with J.T. Two officers, who had brought defendant from the lockup to an interview room, kept asking the same questions "over and over again." The officers kept giving defendant "different scenarios" about what could have happened, which defendant denied.

¶ 24 Defendant acknowledged that, from the time he picked up J.T. on February 16 to the time that defendant dropped J.T. off, defendant was the only adult male who J.T. had contact with. Defendant also acknowledged that, in February, it would not have been hard to open a window. At one point when defendant was using the bathroom, J.T. came to the open bathroom door, and defendant was standing with his penis out. However, J.T. would have seen only defendant's back. Defendant did not close the door because he was used to living alone. When defendant heard J.T. come to the bathroom door, he told J.T. that he was using the bathroom. Asked if that got him excited, he replied: "Not really." At that time, defendant was wearing pants, long underwear,

boxers and briefs, because it was cold outside. Although it was 86 degrees in the apartment, defendant did not take off any layers because he liked the heat. Defendant's pants were zipped up when he exited the bathroom. After noting that J.T. was still sitting at the foot of the bed watching the movie, defendant returned to the kitchen.

¶ 25 During the entire 1 hour and 45 minutes that J.T. was in defendant's home, defendant spent a total of 15 minutes with him. At one point, when defendant was standing in the bedroom, J.T. tried to wrestle with him by jumping on defendant's back, but defendant threw J.T. off and told him they did not have time to play. At some point, defendant was sitting on the bed with J.T.

¶ 26 Trial Court's Ruling

¶ 27 During closing argument, trial counsel argued, among other things, that the State failed to see if there was DNA evidence on the bed and that the chemist testified that "she doesn't know how, when, how long that substance had been on the child." In rebuttal, the State argued, among other things: "why is there D.N.A. on [J.T.'s] butt? That's the smoking gun. That's the question that this Court ought to be asking." Regarding the semen, the State argued: "The defendant wants you to believe, I don't know how, it just showed up one day?"

¶ 28 The trial court found defendant guilty of all charges. In doing so, the court found that defendant's DNA was found on the buttocks area of the minor, that the testimony of the minor victim was unimpeached, that defendant's initial statement corroborated the victim, and that defendant broke down crying after giving it. The trial court denied defendant's posttrial motions. In its ruling, the trial court stated that the victim's testimony was not impeached "at all," that the victim's testimony was corroborated by the DNA evidence, and that it found credible Erickson's testimony regarding defendant's statements to the police. The court then sentenced defendant.

¶ 29       On direct appeal, we affirmed the trial court's judgment. *Mitchell*, 2016 IL App (1st) 133126-U, ¶ 83. In doing so, we found that J.T.'s outcry to his mother a day later should not have been admitted under the excited utterance exception to the hearsay rule, but we found the error harmless. *Id.* ¶¶ 79-81. Rejecting defendant's claim of insufficient evidence, we found that, "[a] lack of injury does not disprove sexual abuse." *Id.* ¶ 56. We were not persuaded by defendant's arguments that the DNA evidence failed to implicate him in the commission of the offense or that the trial court misunderstood the DNA evidence. *Id.* ¶¶ 57-62.

¶ 30                                Postconviction Petition

¶ 31       In April 2017, defendant filed a *pro se* postconviction petition that alleged trial counsel was ineffective for failing to: conduct a pretrial investigation; move to suppress out-of-court statements; challenge the indictment; and call an expert witness. He also alleged appellate counsel was ineffective for failing to raise the alleged claims on appeal.

¶ 32       As for the expert witness claim, defendant alleged that trial counsel was ineffective for stipulating to the testimony of the State's expert witness and for failing to call an expert witness for the defense, which would have rebutted the State's expert witness. Defendant asserted that a defense expert could have given the trial court "a better understanding" of both the sexual assault kit and the DNA evidence. In particular, defendant argued that an "expert witness could have attested to the very fact that it would have been virtually impossible for [there] not [to] be some kind of 'anus' injury by [defendant] being a 46 yr. old man and J.T. only being [an] 8 yr. old." Defendant further stated that trial counsel was ineffective by entering into the stipulation "of the [n]urse who conducted the sexual assault kit test in which came back negative and no sign or evidence of 'anus' injury."

¶ 33    Defendant asserted that he "met both prongs of [*Strickland*]" and showed that trial counsel's performance "fell well below the reasonable level of assistance due to the fact that [t]rial counsel stipulated to sexual assaults, and aggravated criminal sexual abuse, and DNA evidence instead of calling expert witnesses to rebut the State's expert witness." He stated that, "[p]rejudice has now also been met. Minus the [a]bove mishap the outcome of trial would have [been] different."

¶ 34    The trial court ordered the appointment of an attorney, and the petition proceeded to the second-stage. The matter was continued a number of times, and the record shows that postconviction counsel was investigating or attempting to recreate the file. On June 17, 2022, postconviction counsel informed the court that he "referred [defendant's] case to our friends at clinical departments" and had "not heard back from with their review." A half-sheet entry for that day states that the public defender's "forensic unit" is "examining." On August 5, 2022, postconviction counsel told the court that he had "consulted with our forensics unit, and they are supposed to supply me with some information to help me draft a supplemental."

¶ 35    On November 1, 2022, postconviction counsel filed a Rule 651(c) certificate, stating that he had (1) consulted with defendant "by phone, mail, electronic means or in person to ascertain his contentions of deprivation of constitutional rights"; (2) examined the record; and (3) "made amendments to the petition filed pro se, they [*sic*] are necessary for an adequate presentation of petitioner's contentions." On that same day, postconviction counsel also filed a supplemental petition.

¶ 36    The supplemental petition stated that it "augment[ed] [defendant's] previously filed" *pro se* petition with three claims: (1) that trial counsel was ineffective for stipulating to the nurse's testimony that J.T. had no injury where live testimony would have been more effective; (2) that

trial counsel was ineffective for failing to call an expert regarding secondary DNA transfer; and (3) that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness.

¶ 37     With respect to the second claim, at issue here, the supplemental petition argued that "J.T. could have come into contact with semen that remained on the bed sheets as a result of sexual relations with Anita, that occurred hours earlier. The positive result for semen on J.T. was a result of secondary transfer from the presence of semen on the sheet of the bed that J.T. was jumping around in." He asserted that Nurse Healy's stipulated testimony indicated that semen was present on the buttock swab, not the anal swab, which shows that the semen indicated on J.T. was on the surface of his body. Defendant stated that defense counsel did not provide testimony required to explain the existence of his "skin cells and the presence of semen on J.T.'s skin" and "[t]his lack of testimony led the court to conclude the only explanation would be direct contact, that the defendant ejaculated on J.T." He asserted that defense counsel's failure to call an expert fell below the acceptable standard of representation and led to his conviction. To support this claim, postconviction counsel attached to the supplemental petition an article from the *Journal of Forensic Sciences*, dated January 2016, and titled "Could Secondary DNA Transfer Falsely Place Someone at the Scene of a Crime?"

¶ 38     The State moved to dismiss defendant's petition, arguing among other things, that the trial court should reject the claim regarding a transference expert where defendant failed to support this claim with an affidavit from a proposed expert witness. The State argued that defendant's claim should be dismissed for lack of support and that "[f]ailure to attach the necessary documentation to the post-conviction by itself justifies the petition's summary dismissal."

¶ 39     At the hearing on the State's motion to dismiss defendant's petition, postconviction counsel argued, among other things, that trial counsel was ineffective for stipulating to Nurse

Healy's testimony that there was no injury, and "[t]he lack of injury supports [defendant's] testimony that no sexual assault occurred." Postconviction counsel stated that "with no physical evidence of injury, the State relied on DNA evidence as their only physical evidence to support" J.T.'s testimony, and trial counsel "failed to provide any explanation for [defendant's] DNA being present" on J.T. Postconviction counsel stated that there was "ample testimony presented" to support "secondary transfers in explanation," but trial counsel "failed to present any expert testimony to support this theory of the case." Postconviction counsel argued:

> "The fact that [defendant] had recent sexual relations with a woman in his bed prior to J.T. being at his apartment was relevant testimony. J.T. sat on [defendant's] bed in his underwear in a hot apartment. An expert would have been able to explain how secondary transfer could occur resulting in positive DNA results on the child, but no expert testimony was presented by the defense. This amounted to ineffective assistance of counsel."

¶ 40    Postconviction counsel further argued that, "[c]onsidering both the lack of injury and the probability of secondary transfer, the results of the trial could have been different." Counsel stated that he had supported the secondary transfer claim with articles attached to the petition and there was "ample testimony to support secondary transfer."

¶ 41    Following argument, the court granted the State's motion to dismiss defendant's postconviction petition. In doing so, with respect to the claim that trial counsel failed to call an expert on secondary DNA transfer, the court stated that there was no affidavit attached to the petition showing the testimony of the "expert witness would have been favorable" to defendant. The court noted that defendant presented articles on DNA transfer but did not provide an "expert who examined this evidence or could even say that that was a possibility of secondary transfer."

¶ 42    This appeal follows.

¶ 43                                    II. ANALYSIS

¶ 44        Defendant contends that postconviction counsel provided unreasonable assistance by failing to attach an expert's affidavit to support his claim in his supplemental petition that trial counsel was ineffective for failing to call an expert witness on secondary DNA transfer.

¶ 45        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a statutory remedy for criminal defendants who claim their constitutional rights were violated in the trial court. *People v. Edwards*, 2012 IL 111711, ¶ 21. "It is not a substitute for appeal but, rather, a collateral proceeding that attacks a final judgment." *People v. Ealy*, 2024 IL App (1st) 221748, ¶ 30.

¶ 46        The Act provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition only if it is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2020); *Domagala*, 2013 IL 113688, ¶ 32. At the second stage, the court may appoint counsel if a defendant is indigent and unrepresented by counsel, and the State may file a motion to dismiss or answer the petition. 725 ILCS 5/122-4, 122-5 (West 2020); *Domagala*, 2013 IL 113688, ¶ 33. At this stage, the trial court "must determine whether the petition and any accompanying documentation make a 'substantial showing of a constitutional violation.' " *Domagala*, 2013 IL 113688, ¶ 33 (quoting *People v. Edwards,* 197 Ill. 2d 239, 246 (2001)). At this stage, "all well-pleaded facts are taken as true but nonfactual and nonspecific assertions are patently insufficient." *People v. Wise*, 2024 IL App (2d) 191139, ¶ 18. If a defendant makes the required "substantial showing," then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 47        Here, the trial court granted the State's motion to dismiss defendant's petition at the second stage, so no third-stage evidentiary hearing was held. Defendant is not arguing that he made

a substantial showing of a constitutional violation at the second stage, but he rather contends that postconviction counsel provided unreasonable assistance at this stage.

¶ 48    We review a trial court's dismissal of a defendant's postconviction petition at the second stage, which occurred here, *de novo. People v. Addison*, 2023 IL 127119, ¶ 17. In addition, when the issue requires a "proper interpretation of a supreme court rule, our review is *de novo*." *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007). Under *de novo* review, we perform the same analysis that a trial court would perform. *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 49    In a postconviction proceeding, a defendant does not have a constitutional right to counsel. *Addison*, 2023 IL 127119, ¶ 19. Rather, a defendant is entitled only to the level of assistance granted by the Act, which our supreme court has labeled as "reasonable assistance." *Id.* This level of assistance is "less than that afforded by the federal and state constitutions," and is appropriate in this context since the defendant has already lost the presumption of innocence. *Id.* In a postconviction proceeding, "[c]ounsel is appointed not to protect postconviction petitioners from the prosecutorial forces of the State but to shape their complaints into the proper legal form and to present those complaints to the court." *Id.*

¶ 50    To ensure that postconviction counsel provides a reasonable level of assistance, Rule 651(c) outlines certain duties for postconviction counsel. *Id.* ¶ 20. This rule provides, in relevant part, that:

> "The record filed in that court shall contain a showing, which may be made by the certificate of petitioner's attorney, that the attorney [1] has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, [2] has examined the record of the proceedings at the trial, and [3] has made any amendments to the petitions filed *pro se* that are necessary for an adequate

presentation of petitioner's contentions." (Bracketed information added.) Ill. S. Ct. R. 615(c) (eff. July 1, 2017).

"Postconviction counsel's obligation is to investigate and properly present the claims raised by the petitioner." *People v. Frey*, 2024 IL 128644, ¶ 24. Postconviction counsel is not required to raise additional claims on the petitioner's behalf (*id.*), but counsel's duty of reasonable assistance applies to all additional claims that counsel adds to a *pro se* petition. *People v. Agee*, 2023 IL 128413, ¶ 46. Further, it is mandatory to comply with the rule (*Addison*, 2023 IL 127119, ¶ 21) but "substantial compliance" is sufficient. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 18.

¶ 51 Once postconviction counsel files a Rule 651(c) certificate, as happened in this case, "a rebuttable presumption of reasonable assistance arises." *Addison*, 2023 IL 127119, ¶ 21. "It is defendant's burden to overcome this presumption by demonstrating his attorney's failure to substantially comply with the duties mandated by Rule 651(c)." *Profit*, 2012 IL App (1st) 101307, ¶ 19. One way a defendant may overcome the presumption is to show that postconviction counsel "did not make all necessary amendments to the *pro se* petition," such as "making amendments that are necessary to overcome procedural bars." *Addison*, 2023 IL 127119, ¶ 21.

¶ 52 The requirement in Rule 651(c) that postconviction counsel make necessary amendments does not mean that counsel is required to advance frivolous or patently nonmeritorious claims. *People v. Greer*, 212 Ill. 2d 192, 205 (2004). However, once counsel has reviewed the *pro se* petition and determined which claims to pursue, reasonable assistance requires counsel to "shape the claims into the proper form." *Addison*, 2023 IL 127119, ¶ 26. "The supreme court has 'repeatedly held that the purpose of Rule 651(c) is to ensure that counsel shapes the petitioner's claims into proper legal form and presents those claims to the court.' " *People v. Collins*, 2021 IL App (1st) 170597, ¶ 38 (quoting *People v. Perkins*, 229 Ill. 2d 34, 43-44 (2007)).

¶ 53    Where "counsel did not comply with Rule 651(c), our case law dictates that the cause should be remanded without a consideration of whether the petition's claims have merit." *Addison*, 2023 IL 127119, ¶ 33. A defendant need not show prejudice to gain a remand, and counsel's failure to comply with Rule 651(c) is not subject to a harmless-error analysis. *Id.* ¶ 35.

¶ 54    Defendant's only contention is that postconviction counsel provided unreasonable assistance because counsel alleged in the supplemental petition that trial counsel was ineffective for failing to call an expert to testify about secondary DNA transfer, but counsel failed to attach to the petition an affidavit from an expert witness to support this claim. He asserts that it was unreasonable assistance for counsel to pursue the claim without including a favorable affidavit from an expert witness, or documenting efforts to obtain such an affidavit. According to defendant, counsel's failure to investigate and support the claim he chose to pursue overcomes any presumption of reasonableness given by counsel's filing of the Rule 651(c) certificate.

¶ 55    Under the Act, a "petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2020). Generally, "[a] court may reasonably presume postconviction counsel made a concerted effort to obtain evidence in support of postconviction claims, but was unsuccessful." *People v. Wallace*, 2016 IL App (1st) 142758, ¶ 27 (citing *People v. Johnson*, 154 Ill. 2d 227, 241 (1993)); *People v. Johnson*, 2022 IL App (1st) 190258-U, ¶ 37. This presumption may be "flatly contradicted by the record." *Johnson*, 154 Ill. 2d at 241; *Johnson*, 2022 IL App (1st) 190258-U, ¶ 37.

¶ 56    Here, as previously noted, postconviction counsel filed a Rule 651(c) certificate, which stated that he consulted with defendant, examined the record, and "made amendments to the petition filed pro se, they [*sic*] are necessary for an adequate presentation of [defendant's]

contentions." These assertions are not contradicted by the record, so we find the certificate valid. See *Wallace*, 2016 IL App (1st) 142758, ¶ 26 (finding the Rule 651(c) certificate facially valid where the assertions made therein were not contradicted by the record). As such, there is a rebuttable presumption that postconviction counsel provided reasonable assistance as required by Rule 651(c). See *Profit*, 2012 IL App (1st) 101307, ¶ 19 ("The filing of a Rule 651(c) certificate gives rise to a rebuttable presumption that post-conviction counsel provided reasonable assistance.").

¶ 57     We note that in defendant's reply brief, he asserts that counsel's Rule 651(c) certificate "certified only that the amendments he made were necessary ones" and did not meet the requirements of the rule. See Ill. S. Ct. R. 651(c) (eff. July 1, 2017) ("The record filed *** shall contain a showing ** that the attorney *** has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions."). To the extent defendant is arguing that the Rule 651(c) certificate did not meet the requirements of the rule, his argument is forfeited because he raised this issue for the first time in his reply brief. See Ill. S. Ct. R. 341(h) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 58     Defendant has not met his burden of overcoming the rebuttable presumption that postconviction counsel provided reasonable assistance. Postconviction counsel amended defendant's *pro se* petition with the supplemental petition and added three claims, including the claim at issue here that trial counsel was ineffective for failing to call an expert witness on secondary DNA transfer. In particular, counsel explained how J.T. would have come into contact with semen that had remained on defendant's bed sheets. Counsel then alleged that the "positive result for semen on J.T. was a result of secondary transfer from the presence of semen on the sheet

of the bed that J.T. was jumping around in," which was also "true for any skin cells that were a match for [defendant] from the buttocks swab." Counsel argued that trial counsel did not present the testimony required to explain the presence of defendant's skin cells and semen on J.T.'s skin and that this "lack of testimony led the court to conclude the only explanation would be direct contact, that the defendant ejaculated on J.T."

¶ 59       To support this claim, postconviction counsel attached to the supplemental petition an article from the *Journal of Forensic Sciences* on secondary DNA transfer entitled, "Could Secondary DNA Transfer Falsely Place Someone at the Scene of a Crime?" Citing this article, counsel explained that " 'Secondary transfer occurs when DNA is transferred from one object or person to another via an intermediate object/person' " and it " 'should be a concern for forensic DNA analysts because (i) it could falsely link someone to a crime; (ii) it could introduce extraneous DNA, or foreign DNA, into a forensic sample; and (iii) it could lead analysts and other medicolegal professionals to falsely conclude that DNA left on an object is a result of direct contact.' " Accordingly, postconviction counsel added a new claim that trial counsel was ineffective for failing to call an expert witness on secondary DNA transfer and also attached to the petition a journal article on the topic as "other evidence" to support the claim. See 725 ILCS 5/122-2 (West 2020 ("The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached.").

¶ 60       Further, not only did counsel attach a journal article to support the claim, but there is also nothing in the record that contradicts the presumption that counsel made an effort to obtain affidavits in support of his claim but was unsuccessful. See *People v. Porcayo-Bahena*, 2024 IL App (2d) 210393-UB, ¶¶ 20-22 (the presumption that counsel provided reasonable assistance when counsel files a Rule 651(c) certificate also "entails a further presumption that counsel made an

18

effort to obtain necessary 'affidavits or other documents' but was unsuccessful"). There is also nothing in the record to show that counsel did not know the requirements of the Act or his obligations as postconviction counsel.

¶ 61        Under these circumstances, we cannot find that postconviction counsel provided unreasonable assistance where counsel attached to the supplemental petition a journal article from the *Journal of Forensic Sciences* to support the claim that trial counsel was ineffective for failing to call an expert on secondary DNA transfer rather than an affidavit from an expert witness on this subject.

¶ 62        Defendant cites *People v. Wise*, 2024 IL App (2d) 191139, to support his argument that counsel provided unreasonable assistance for failing to attach an expert affidavit on secondary DNA transfer. *Wise* is distinguishable.

¶ 63        In *Wise*, the reviewing court found that the presumption of reasonable assistance created by postconviction counsel's Rule 651(c) certificate was rebutted where the claims in the amended petition were "woefully incomplete" and "dismissed due to their incompleteness." *Id.* ¶ 19. Postconviction counsel's amended petition included claims that trial counsel was ineffective for failing to: present an alibi defense; move for a substitution of judge; obtain copies of the police officers' field notes; and present mitigation evidence at sentencing. *Id.* ¶¶ 9-10. The amended petition also alleged, *inter alia*, that the trial court erred when it "forc[ed]" defense counsel to tender the defendant's medical records to the State. *Id.*

¶ 64        In finding the claims in the amended petition "woefully incomplete," the reviewing court concluded that the petition " 'failed to allege the basic elements of the claims it raised.' " *Id.* ¶ 20 (quoting *People v. Dixon*, 2018 IL App (3d) 150630, ¶ 16). As for the alibi defense, the court explained that the claim required "at a minimum—a statement or an offer of proof about where

defendant supposedly was at the time of the crime." *Id.* ¶ 19. As for the other claims mentioned above, the court explained that the petition should have stated whether trial counsel should have moved for a substitution of judge for cause or as a matter of right, and what the grounds were and provided what specific information in the police officers' field notes was relevant. *Id.* The court further explained that the amended petition did not identify "*any* [mitigation] evidence" that trial counsel could or should have presented at sentencing, and did not include what information from the medical records was "damaging or prejudicial" or how tendering them to the State "impacted his trial in any way." (Emphasis in original.) *Id.* The court stated that "[a] petition that fails to allege basic, specific facts to support its general claims leaves the trial court with 'virtually nothing *** to take as true at the second stage,' " and it concluded that "[b]ecause the petition failed to allege the basic elements of the claims it raised, the petition was not in appropriate legal form to present the defendant's claims to the court.' " *Id.* ¶ 20 (quoting *Dixon*, 2018 IL App (3d) 150630, ¶ 16).

¶ 65 Unlike *Wise*, where postconviction counsel failed to allege "basic elements" of the claims in the amended petition to support the general claims, here, postconviction counsel's petition did not fail to allege basic facts or elements to support defendant's claim that trial counsel was ineffective for failing to call an expert on secondary DNA transfer.

¶ 66 Defendant also asserts that postconviction counsel provided unreasonable assistance because counsel did not adequately plead prejudice, which is an essential element for a claim of ineffective assistance of counsel.

¶ 67 For an ineffective assistance of counsel claim, a "defendant must establish that counsel's performance fell below an objective standard of reasonableness and the defendant was

prejudiced by counsel's substandard performance." *Agee*, 2023 IL 128413, ¶ 50 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

¶ 68    In the supplemental petition, citing *Strickland*, postconviction counsel explained that for an ineffective assistance of counsel claim, a defendant must show (1) counsel's performance was deficient, and (2) counsel's performance prejudiced the defense. As previously discussed, in the supplemental petition, postconviction counsel alleged that trial counsel did not present testimony regarding secondary DNA transfer to "explain the existence of [defendant's] skin cells and the presence of semen on J.T.'s skin," which "led the court to conclude the only explanation would be direct contact, that the defendant ejaculated on J.T." Counsel also alleged that trial counsel's failure to call an expert "fell below the acceptable standard of representation" and led to his conviction. As such, postconviction counsel alleged that the failure to present testimony on secondary DNA transfer prejudiced his defense, as it led to the court concluding that there was only one explanation for the presence of his DNA on J.T.

¶ 69    Further, at the hearing on the State's motion to dismiss the petition, postconviction counsel also argued that defendant's defense was prejudiced by trial counsel's failure to not present testimony from an expert on secondary DNA transfer, as postconviction counsel stated that "[c]onsidering both the lack of injury and the probability of secondary transfer, the results of the trial could have been different" had counsel presented such testimony. Accordingly, the record shows that postconviction counsel sufficiently alleged that trial counsel's deficient performance in failing to present an expert witness on secondary DNA transfer prejudiced defendant's defense.

¶ 70    In sum, defendant has not met his burden of overcoming the presumption that postconviction counsel provided reasonable assistance.

### III. CONCLUSION

21

¶ 71 For the foregoing reasons, we affirm the circuit court's second-stage dismissal of defendant's postconviction petition.

¶ 72 Affirmed.

¶ 73 JUSTICE ODEN JOHNSON, dissenting:

¶ 74 While I agree with the majority on two major premises, I would nevertheless reverse and remand for another second-stage hearing, on the ground that postconviction counsel failed to provide reasonable assistance. Therefore, I respectfully dissent.

¶ 75 First, the majority and I both agree that a counsel's failure to make an amendment needed to overcome a procedural bar qualifies as unreasonable assistance, especially where the claim is one that counsel specifically identified as one of the few claims worth pursuing. It would be difficult to disagree with this point, since there is a supreme court case that is directly on point. Quoting our supreme court, the majority states: "One way a defendant may overcome the presumption [of reasonable assistance] is to show that postconviction counsel 'did not make all necessary amendments to the *pro se* petition,' such as 'making amendments that are necessary to overcome procedural bars.' " *Supra* ¶ 51 (quoting *People v. Addison*, 2023 IL 127119, ¶ 21).

¶ 76 Second, the lack of an affidavit constitutes such a procedural bar. Again, we have another Illinois Supreme Court case right on point. In *People v Enis*, 194 Ill. 2d 361, 380 (2000), our supreme court held that a postconviction "claim that trial counsel failed to investigate and call a witness *must be supported by an affidavit* from the proposed witness." (Emphasis added.) *People v. Enis*, 194 Ill. 2d 361, 380 (2000). In the case at bar, the transcript of the hearing establishes that the trial court, relying on counsel, considered only the couple of trial errors identified by counsel and ignored the rest of defendant's claims. Counsel identified only two trial errors: the stipulation to the nurse's testimony, and the failure to obtain a transference expert. As the majority

acknowledges, the transference claim was a new claim added by counsel. *Supra* ¶ 59. Thus, we both reject the State's argument that it was in any way defendant's responsibility to support this claim in his *pro se* petition. It would be absurd to impose on defendant the task of supporting a claim that he never raised. Further, the record is crystal clear that the trial court dismissed the transference claim, solely based on the procedural default by counsel.

¶ 77    These two premises lead to an inexorable conclusion: (1) failure to overcome a procedural bar for an identified and added claim qualifies as unreasonable assistance; and, (2) the lack of an affidavit is a procedural bar. Ergo, this had to have been unreasonable assistance.

¶ 78    Before I proceed with my analysis of the parties' arguments, I must include certain facts that were omitted from the majority's opinion.

¶ 79                                    Background

¶ 80    For the most part, I agree with the majority's description of the trial evidence. However, as discussed in detail below, this case will be reviewed *de novo* and all facts, even those that may be favorable to the defense or may not change the outcome, must be considered.

¶ 81    First, the victim testified at trial that he had had an "interview" with assistant State's attorneys on the day of trial. The victim agreed that meeting with the State shortly before his trial testimony helped him remember the details. The victim, who was 12 at the time of trial, was trying to recall details from four years prior when he was 8, and the victim's mother testified he had "developmental delays" and was in special classes. The potential for coaching of a young witness, particularly in the "details" that would make his story more credible, supported the defense's questioning of the victim's independent recall.

¶ 82    Second, Sergeant Casey Erickson, who testified about defendant's post-arrest statement, admitted that he had not taken a single note during the hours that he met with defendant,

23

over the course of two days and multiple interviews. Erickson acknowledged that it was a few days after the interviews that he completed his report, which he based entirely on his own memory, although Erickson had a partner with him. Erickson also acknowledged that he knew what the victim said when he was interviewing defendant. Defendant's "statement," then, was not so much a statement, as a composite authored by Erickson based on his recall of several different interviews. Since defendant never gave a written or videotaped statement, Erickson's lack of notes, his time delay in memorializing the "statement," his prior knowledge of the victim's story, and his selection of different details from different interviews to string into one narrative lends some support to defendant's claim that what Erickson memorialized was Erickson's recall of the scenarios that Erickson presented to defendant. Defendant testified that it was the police who presented scenarios to him, rather than the other way around.

¶ 83    Third, J.T.'s mother testified that J.T. did not bathe between when defendant dropped J.T. off at home and when J.T. went to the hospital where the assault kit was performed and the swab taken. This fact makes defendant's transference or stickiness argument more plausible.

¶ 84    Fourth, defendant called only two witnesses at trial, namely, himself and Emerson Branch. Yet, Branch's testimony, or half of defendant's case, is absent from the majority's statement of facts. Branch, a Chicago firefighter. paramedic and father of five, corroborated defendant's version of events, namely, that J.T. wound up at defendant's home only because Branch did not answer his phone. Defendant testified that he was taking J.T. to Branch's home so J.T. could play with the other kids there. During his testimony, Branch confirmed that Branch was expecting defendant and J.T. Defendant testified that, on the way to Branch's house, defendant called Branch to make sure he was there, but received no answer from either Branch's house or cell phone. That was the reason J.T. wound up at defendant's home. Corroborating that defendant

tried to reach him, Branch testified that he later realized that he had missed messages on his phone from defendant.

¶ 85       Fifth, Branch's testimony also corroborated why defendant, as defendant testified, was barely in the bedroom with J.T.--namely, he had to clean up. Branch testified that Branch's brother, his brother's kids, and his brother's father-in-law were all staying at defendant's home, while they visited Chicago over the long Washington Birthday weekend. Defendant had only a one-bedroom apartment, so his guests stayed in sleeping bags in his living room. Branch's testimony lent credence to defendant's testimony that, after setting up J.T. with a video in the bedroom, defendant was busy washing dishes and generally picking up the kitchen and the living room after the weekend.

¶ 86                                    Analysis

¶ 87       As we all agree (*supra* ¶ 48), our review is *de novo*. *People v. Suarez*, 224 Ill. 2d 37, 41-42 (2007). At the second stage, the issue is normally whether defendant has made a sufficiently "substantial showing" of a claim, such that his petition will be advanced to a third-stage evidentiary hearing. *People v. Domagala*, 2013 IL 113688, ¶ 34.

¶ 88       What is somewhat unusual about this appeal is that defendant is *not* arguing that he made a substantial showing. Instead, he is tacitly conceding that a substantial showing was not made and arguing instead that his postconviction counsel's assistance was unreasonable and therefore he deserves another bite at the apple—another second-stage hearing, with a different counsel who could presumably make the substantial showing that was previously lacking.

¶ 89       Defendant further argues that he need not show that he was prejudiced by postconviction counsel's unreasonable performance or that the underlying claim had merit, if the

record shows that he did not receive reasonable assistance of postconviction counsel. He is correct on this point, as the majority agrees. *People v. Addison*, 2023 IL 1127119, ¶¶ 35, 42.

¶ 90    The majority agrees, as it must, that, "[w]here 'counsel did not comply with Rule 651(c), our case law dictates that the cause should be remanded without a consideration of whether the petitioner's claims have merit.' " *Supra* ¶ 53 (quoting *Addison*, 2023 IL 12719, ¶ 33); *People v. Suarez*, 224 Ill. 2d 37, 47 (2007) (our supreme court has "consistently held" that remand is required where postconviction counsel fails to fulfill Rule 651(c) duties, "regardless of whether the claims raised in the petition had merit"). A defendant does not have to show prejudice to gain a remand, and counsel's failure to comply with Rule 651 is *not* subject to a harmless error analysis. *Addison*, 2023 IL 12719, ¶ 35; *supra* ¶ 53.

¶ 91    In this way, "there is a significant difference between" what it takes to succeed "on a claim of unreasonable assistance of counsel at the second stage of postconviction proceedings," as opposed to "a claim of ineffective assistance of counsel under *Strickland*." *Addison*, 2023 IL 12719, ¶ 37. The reason for this is that a defendant who succeeds on a *Strickland* claim gains the reversal of a conviction and a whole new trial, whereas a defendant who succeeds on an unreasonable assistance claim gains merely another second-stage postconviction proceeding. *Addison*, 2023 IL 12719, ¶ 37.

¶ 92    The majority also (1) agrees that the transference claim was a new claim added by counsel (*supra* ¶ 59) and (2) does not dispute that counsel failed to satisfy a prerequisite for its consideration. Because counsel identified the couple of claims he deemed worthy, the trial court did not even consider the other claims defendant made and it dismissed his whole petition with prejudice.

¶ 93      Nonetheless, the majority finds reasonable assistance, because counsel still made arguments and attached an article to the petition. But, frankly, the arguments make little difference, when there is a procedural bar that prohibits those arguments from being considered.

¶ 94      A postconviction counsel has few requirements but one of those requirements is to make "any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's claims." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 95      In the case at bar, it would be hard for the State to argue that defense counsel made the necessary amendments for consideration of the transference claim, when that is the very basis upon which the State obtained a dismissal of it. In its motion to dismiss before the trial court, the State cited *People v. Enis*, 194 Ill. 2d 361, 380 (2000), which provides that a postconviction "claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness." Further, "[i]n the absence of such an affidavit" at the second stage, "a reviewing court cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant, and further review of the claim is unnecessary." *Enis*, 194 Ill. 2d at 380.

¶ 96      The arguments now made by the State regarding the lack of an affidavit were either rebutted by our supreme court or by the record. First, the State argues that it was defendant's obligation to find an expert witness since it was his claim. *People v. Williams*, 186 Ill. 2d 55, 60-61 (1999) (citing *People v. Johnson*, 154 Ill. 2d 227, 247-48 (1993) (postconviction counsel is under no obligation to seek out an expert or conduct a fishing expedition to support defendant's random claims). However, defendant did not make any assertions about a transference expert in his original petition; this was a new claim added by counsel, as the majority acknowledges. *Supra*

¶ 59. See *People v. Frey*, 2024 IL 128644, ¶ 24 (postconviction counsel may raise additional claims on a defendant's behalf).

¶ 97        Second, even if defendant's petition could be construed as discussing it, this was one of only two trial errors identified by counsel as worth pursuing and, therefore, it needed to be supported to avoid a procedural default. Once counsel reviews the *pro se* petition and determines which claims to pursue, reasonable assistance requires counsel to shape those identified claims into proper form. *Addison*, 2023 IL 12719, ¶ 26: *Enis*, 194 Ill. 2d 361, 380 (2000), (a postconviction claim that trial counsel failed to call a witness must be supported at the second stage "by an affidavit from the proposed witness"). Our supreme court has clearly stated: "We fail to see how it can be reasonable assistance of counsel for an attorney to identify claims worth pursuing but then fail to shape them into proper form." *Addison*, 2023 IL 12719, ¶ 26.

¶ 98        Third, contrary to the State's assertion, the trial court did not consider the claim on its merits, specifically because there was no expert. The court summarily dismissed the claim without considering it further, due to the lack of an affidavit—exactly what the State had argued for. The State cannot argue a point before the trial court, win on it, and then argue before us that this did not happen.

¶ 99        The merits of defendant's claim are not before us, so I will not opine on whether defendant testified that the earlier sex took place on the bed, whether he testified that he previously ejaculated, or whether one needed an expert to make an argument about the transference or stickiness of semen. The fact remains that, when one makes an argument about a proposed witness, the court may dismiss it out of hand for lack of an affidavit, without considering the merits. That is exactly what happened here: the court said that it wanted the expert to consider the merits and, because there was none, it did not.

¶ 100     Fourth, the State argues that the incomplete Rule 651(c) certificate filed by counsel carries the day, by creating a presumption of reasonable assistance. In reply, defendant argues that counsel's incomplete certificate failed to do what the State argued. The majority finds that defendant forfeited this argument by not raising it in defendant's initial brief. *Supra* ¶ 57. However, a defendant is allowed to reply to arguments the State makes. That is what a reply brief is for. IL S. Ct. R. 341(j) (eff. Oct. 1, 2020) (reply brief is for "replying to arguments presented in the brief of the appellee"). It was the State that quoted counsel's Rule 651(c) certificate almost in full in its brief and then argued that it sufficed to create the presumption. Defendant's argument is a valid reply.

¶ 101     In a Rule 651(c) certificate, counsel must certify only three points, including that counsel "made any amendments *** that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Counsel did not so certify, and the majority does not claim that he did. Instead of certifying that he made any amendments that were necessary, counsel certified that the amendments *that he did make* were necessary ones.  Given counsel's failure to make an amendment necessary for adequate presentation, this does not seem to be an idle omission--particularly where he quoted the first two points from the statute, almost word for word. The certificate itself seems to reflect an awareness that counsel had not made the "amendments *** that are necessary for adequate presentation." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 102     I take no position on defendant's *pro se* petition because, on remand, new counsel is free to amend it or supplement it with additional points, arguments, evidence, or affidavits from any proposed expert or other witness. *People v. Schlosser*, 2017 IL App (1st) 150355, ¶ 36 ("it

was error to reappoint the same APD after this court found that his representation was unreasonable").

¶ 103       For all the foregoing reasons, I would reverse and remand for a new second-stage postconviction proceeding with new counsel. Hence, I respectfully dissent.